Maureen M. BRITELL, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. CIV. 99–11253–NG.

United States District Court,
D. Massachusetts.

May 16, 2001.

212

John H. Henn, Foley, Hoag & Eliot, Boston, MA, for Maureen M. Britell, Andrew P. Britell, Plaintiffs.

Neil H. Koslowe, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for USA, Defendants.

### MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT

GERTNER, District Judge.

In the first few weeks of 1994, Maureen M. Britell ("Britell") and her husband eagerly anticipated the birth of their second child. Then, to their horror, one of Britell's doctors discovered that the fetus was anencephalic: It had no forebrain or cranium and could not survive outside the womb. Britell's doctors advised abortion, and her parish priest agreed. She aborted the fetus in February of 1994.

Brittell sought coverage of the abortion from her husband's insurer, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS" or "the Program"). CHAMPUS funds all medically necessary pregnancy services, but it only covers abortions in cases in which the life of the mother would be endangered if the fetus were carried to term. Indeed, the regulation governing CHAMPUS ex-

plicitly excludes coverage for abortions performed because of "fetal abnormalit[ies]," including anencephaly. 32 C.F.R. § 199.4(e)(2). CHAMPUS therefore denied Britell's request for coverage.

Britell then filed this action, claiming that the statute and implementing regulation governing CHAMPUS' coverage of abortions [1] violate the Due Process Clause of the Fifth Amendment. Specifically, Britell argues that, as applied to an abortion of an anencephalic fetus, neither provision bears a rational relationship to any legitimate state interest.[2]

Both Britell and CHAMPUS now move for summary judgment of all claims.[3] For the reasons discussed below, resolution of the summary judgment motions is deferred pending further briefing.[4]

## I. *FACTUAL BACKGROUND*

### A. *Anencephaly*

This controversy began on February 17, 1994,[5] when Britell's physician, Dr. Russel Feingold ("Feingold"), discovered during a routine ultrasound that Britell's fetus suffered from anencephaly.

Anencephaly is a uniformly fatal neural tube defect in which the fetus develops without a forebrain or cranium.[6] Most anencephalic fetuses die during pregnancy or birth. Thirty-two percent of anencephalic fetuses carried to term are born alive, but their prognosis is grim. With continuous life support and intensive neonatal care, some anencephalic infants survive up two months or longer. Without such care, however, fewer than two percent survive longer than seven days. Stubblefield Aff. at ¶¶ 8—14; Bennett Aff. at ¶¶ 8—16.

Additionally, women who carry anencephalic fetuses to term suffer heightened physical and psychological health risks. In late pregnancy, these women create excessive amniotic fluid, which increases the risk of placental abruption (premature separation of the placenta from the uterine wall). Placental abruption, in turn, can

---

1.  10 U.S.C. § 1093(a) and 32 C.F.R. § 199.4(e)(2).

2.  Britell also claims the implementing regulation is arbitrary and capricious, and outside defendant's regulatory authority. The parties' subsequent filings do not addresses this claim, so I ignore it for purposes of this ruling.

3.  The defendant also moves for judgment on the pleadings, on the grounds that under Massachusetts law, the plaintiff's abortion was outside the scope of the legal authorization of her physicians, as the fetus was 25–weeks old at the time of the abortion. As plaintiff has since amended her complaint to indicate that her fetus was in fact only 20–weeks old, this aspect of defendant's motion for judgment on the pleadings is moot. The issue remains in the case, to be addressed at trial. *Infra* note 8.

4.  This is the second round of supplemental briefing I have ordered. I first asked parties to address issues of standing and exhaustion of administrative remedies. With the excep-

tion of the fetal age issue, addressed below, *infra* note 8, I am now satisfied that this action is properly before me. As defendant apparently concedes, CHAMPUS denied coverage of Britell's abortion because "voluntary termination of pregnancy is not a CHAMPUS benefit unless abortion is performed due to a life threatening condition to the mother," and not for any other administrative reason. Further, under 32 C.F.R. § 199.10(a), Britell may not challenge the constitutionality of the CHAMPUS policy through an administrative appeal, so any attempt to seek administrative redress for CHAMPUS' denial of funding would be futile.

5.  Plaintiff's second amended complaint indicates that this ultrasound occurred on February 16, but her statement of material facts suggests that the procedure actually occurred on February 17, one day before the induction of labor.

6.  In 1989, anencephaly occurred in approximately 2 out of every 10,000 live births in the United States. Stubblefield Aff. at ¶ 12.

cause disseminated intravascular coagulopathy (abnormally accelerated blood clotting, with simultaneous uncontrolled bleeding). Further, if delivery is not induced, pregnancies involving anencephalic fetuses can continue long after the normal nine-month period,[7] heightening the health risks associated with late-term pregnancy, including possible liver or kidney failure, blood clots, and hemorrhaging. Finally, knowingly carrying a non-viable fetus to term generates severe psychological stresses. Subblefield Aff. at ¶¶ 18—21, 23—24.

## B. *Britell's Abortion*

Britell alleges that she was approximately twenty-weeks pregnant when Feingold

7. This delayed delivery apparently results in part because an anencephalic fetus has an abnormally small adrenal gland, and adrenal secretions play a key role in triggering spontaneous labor. In one well-documented case, an anencephalic pregnancy lasted for over a year. Stubblefield Aff. at ¶ 19.

8. The age of Britell's fetus is actually a subject of considerable debate. Britell's first and first-amended complaints alleged that the fetus was 25–weeks old at the time of the abortion, but her second-amended complaint revised the age estimate to 20–weeks, based on data from an ultrasound administered at NEMC, and an autopsy of the fetus performed after the abortion. The defendant challenges the revised age figure, citing various medical reasons why the estimate may be inaccurate.

The actual age of the fetus is highly relevant here, due to a Massachusetts law that prohibits abortions after twenty-four weeks of pregnancy, Mass. Gen. Laws Ch. 112 § 12M, and a CHAMPUS regulation that proscribes coverage of any medical procedures not authorized by law, 32 C.F.R. § 199.6(a)(7) ("In order to be considered for benefits, all services ... shall be rendered by ... a CHAMPUS-authorized provider practicing within the scope of his or her license."). Based on these provisions, defendant argues that if the fetus was in fact 25–weeks old at the time of the abortion, as Britell first alleged, then her claims are not justiciable, because she cannot recover from CHAMPUS regardless of the constitutionality

determined her fetus was anencephalic.[8] Until this diagnosis, Britell had believed the fetus was healthy. As a precaution, Feingold recommended that Britell obtain a more sophisticated ultrasound at New England Medical Center ("NEMC") in Boston, but the second ultrasound confirmed the dire diagnosis.

The Britells were devastated by the news that their baby would not survive. Britell reports suffering great emotional trauma whenever the fetus moved inside her.[9] She was unable to sleep or to discuss her misfortune with friends. To cope with their loss, the Britells consulted grief counselors, doctors, family members, and their parish priest.

of the challenged statute and regulation. In a recent supplemental filing, defendant therefore suggests that this Court remand the case to CHAMPUS to determine whether Britell's abortion was within the legal authorization of the physicians who performed it.

I decline to remand this action to CHAMPUS. Doing so would only further delay the case, particularly as any decision by CHAMPUS regarding fetal age would likely be appealed to this Court. *Cf.* 32 C.F.R. 199.10(a) (barring administrative appeals that "challenge the propriety, equity, or legality of any provision of law or regulation"). I recognize, however, that the age of the fetus would have to be resolved before I could render judgment in favor of the plaintiff. I also note CHAMPUS' argument that it might be preferable to resolve the parties' dispute on these statutory grounds. *Harris v. McRae*, 448 U.S. 297, 306, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ("[I]f a case may be decided on either statutory or constitutional grounds, [courts], for sound jurisprudential reasons, will inquire first into the statutory question.").

In light of my present ruling, I need not address the fetal-age question further here. **The parties should, however, be prepared to address this issue (including any waiver arguments) at trial.**

9. In spite of the absence of a forebrain, an anencephalic fetus is capable of some reflexive movement. Bennett Aff. at ¶ 15.

Ultimately, the Britells made the difficult decision to terminate the pregnancy. On February 18, 1994, barely a day after Feingold's initial diagnosis, the physicians at NEMC administered medication to induce labor. The fetus died during delivery, and the diagnosis of anencephaly was confirmed.

### C. *Britell's Interactions with CHAMPUS*

At all times relevant to this action, Britell was insured through CHAMPUS, a program established "to provid[e] an improved and uniform program of medical and dental care for members ... of [the uniformed] services, and for their dependents."[10] 10 U.S.C. § 1071. CHAMPUS is funded through annual congressional appropriations to the Department of Defense ("DOD"). 32 C.F.R. § 199.1(e).

CHAMPUS funds all "medically necessary services and supplies associated with maternity care," 32 C.F.R. § 199.4(e)(16), but the Program is statutorily barred from using funds to "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." 10 U.S.C. § 1093(a). Further, regulations governing CHAMPUS specifically provide:

> Covered abortion services are limited to medical services and supplies only.

Physician certification is required attesting that the abortion was performed because the mother's life would be endangered if the fetus were carried to term. *Abortions performed for suspected or confirmed fetal abnormality (e.g., anencephalic) ... do not fall within the exceptions permitted within the language of the statute and are not authorized for payment under CHAMPUS.*

32 C.F.R. § 199.4(e)(2) (emphasis added). As the plaintiff notes, however, the CHAMPUS regulations specifically exempt treatment for "spontaneous,[11] missed[12] or threatened[13] abortion or termination of an ectopic (tubal) pregnancy" from the coverage restrictions. 32 C.F.R. § 199.2(b).

Following Britell's abortion, NEMC submitted a claim to CHAMPUS, but CHAMPUS refused to cover most of the associated costs.[14] NEMC then filed suit against the Britells, seeking an award of almost $5,000.00. The Britells have since settled their suit with NEMC for $4,000.00. Britell brings this action to recover the costs she paid to NEMC.

## II. *LEGAL BACKGROUND*

### A. *Holding of Harris v. McRae*

My consideration of Britell's claims must be informed by *Harris v. McRae*, 448 U.S.

---

**10.** Britell's husband is a Captain in the Air National Guard.

**11.** A spontaneous abortion is commonly known as a miscarriage. It occurs when a fetus dies in utero and is naturally expelled. Stubblefield Aff. at ¶ 30.

**12.** A missed abortion occurs when the dead products of conception are retained in the uterus for several weeks. Although many missed abortions are naturally expelled within weeks, doctors often advise patients to abort the dead fetus, to reduce the risk of infection and the psychological repercussions of carrying a dead fetus. *Id.* at ¶ 32.

**13.** A threatened abortion occurs when a woman experiences some symptoms of a miscarriage during her first trimester but does not lose the fetus. Many women who experience a threatened abortion continue the pregnancy to term with no further incident. *Id.* at ¶ 31.

**14.** CHAMPUS denied coverage of $4,507.05, the majority of NEMC's claim. CHAMPUS did, however, cover some of the costs associated with an emergency surgical procedure that Britell underwent after delivery, to remove the placenta.

297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), in which the Supreme Court upheld, on its face, a very similar abortion funding restriction, known as the Hyde Amendment.

The version of the Hyde Amendment considered in *McRae* proscribes the use of federal funds to reimburse the cost of abortions under the Medicaid program "except where the life of the mother would be endangered if the fetus were carried to term." *Id.* at 325 n. 27, 100 S.Ct. 2671; *see also* Pub.L. No. 94–439, § 209, 90 Stat. 1434.[15] The *McRae* appellees challenged the Hyde Amendment on several constitutional grounds. Of most relevance here, they argued that the Hyde Amendment violates the equal protection component of the Fifth Amendment, because the Amendment provides reimbursement for "medically necessary services generally," but not for medically necessary abortions. *McRae*, 448 U.S. at 306, 100 S.Ct. 2671.

The *McRae* Court noted "that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution," the classification is presumptively valid unless it implicates a suspect class or " 'rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective.' " *Id.* at 322, 100 S.Ct. 2671 (citing *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). The Court therefore considered, in turn, whether the Amendment (1) impinges on a constitutionally protected substantive right, (2) implicates a suspect class, or (3) fails to advance a legitimate governmental objective.

With respect to constitutionally protected rights or liberties, the Court considered both rights protected by the Due Process Clause of the Fifth Amendment and those protected by the Establishment Clause of the First Amendment.[16] Because the Hyde Amendment withholds funding for abortions rather than directly burdening a woman's right to choose, the Court found no substantive due process violation. *Id.* at 318—19, 100 S.Ct. 2671. Turning to the Establishment Clause, the Court simply noted dismissively that the Amendment "is as much a reflection of 'traditionalist' values towards abortion, as it is an embodiment of the views of any particular religion," before concluding that there is no conflict with the First Amendment. *Id.* at 319—20, 100 S.Ct. 2671.

The Court next considered whether the Hyde Amendment is "predicated on a constitutionally suspect classification." *Id.* at 322, 100 S.Ct. 2671. Drawing on a case decided only three years earlier, *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the *McRae* Court noted that although the Hyde Amendment solely impacts indigent women, " 'financial need alone' " has never " 'identifie[d] a suspect class for purposes of equal protection analysis.' " *McRae*, 448 U.S. at 323, 100 S.Ct. 2671 (citing *Maher*, 432 U.S. at 470—71, 97 S.Ct. 2376).

Thus, the only remaining question for the Court was whether the Hyde Amendment's distinction between medically necessary abortions and all other medically necessary procedures is "rationally related to a legitimate governmental objective" (the "rational-basis test" or "rational-basis

---

**15.** Over time, Congress has employed several versions of the Hyde Amendment. *McRae*, 448 U.S. at 302—03, 100 S.Ct. 2671. The Supreme Court specifically chose to consider the constitutionality of the most restrictive version, because "[i]f [this] version is consti-

tutionally valid, so too are the others." *Id.* at 325 n. 27, 100 S.Ct. 2671.

**16.** The *McRae* plaintiffs also made a Free Exercise argument, but the Court determined they lacked standing to pursue this claim. *Id.* at 320—21, 100 S.Ct. 2671.

scrutiny"). *Id.* at 324, 100 S.Ct. 2671. Here, too, the *McRae* Court found the appellees' arguments unpersuasive. The Court elaborated:

> By subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable expenses of women who undergo abortions ..., Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life. Nor is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions. Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life.

*Id.* at 325, 100 S.Ct. 2671.

Ultimately, therefore, the Court concluded that the Hyde Amendment, "by encouraging childbirth except in the most urgent circumstances," is, on its face, "rationally related to the legitimate governmental objective of protecting potential life." *Id.*

### B. *Britell's Summary Judgment Argument*

Given the Supreme Court's holding in *McRae*, Britell's argument in favor of summary judgment is necessarily limited. She challenges neither the Supreme Court's determination that broad abortion-funding restrictions are constitutional provided they survive rational-basis scrutiny, *id.* at 323, 100 S.Ct. 2671, nor its enunciation of the two most common state objectives for regulating abortion—preserving a woman's health, and protecting a potential human life, *Roe v. Wade,* 410 U.S. 113, 162, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Rather, Britell makes a narrow claim, arguably consistent with both *McRae* and *Roe v. Wade:* She alleges that CHAMPUS' regulations are unconstitutional *as applied to her,* because denying funding for an abortion of an anencephalic fetus—one with no "potential life"—advances no legitimate state interest whatsoever.

In support of this argument, Britell identifies two allegedly irrational CHAMPUS funding distinctions: First, the broad funding distinction between (1) medically necessary pregnancy-related care (which is funded), and (2) a medically necessary abortion of an anencephalic fetus (which is not); and second, the narrower distinction between (1) termination of an ectopic pregnancy or treatment of spontaneous, missed, or threatened abortion (which is funded), and (2) an abortion of an anencephalic fetus (which is not). Britell argues that these distinctions cannot be related to the state's legitimate interest in preserving maternal health, because fetal anencephaly only exacerbates the maternal health risks associated with pregnancy, and it causes extreme psychological distress. Further, she suggests these distinctions cannot advance the state's legitimate interest in protecting potential human life, because most anencephalic fetuses die before birth, and none has a meaningful possibility of living for more than a few weeks outside the womb. Britell therefore concludes that, as applied to her abortion, the CHAMPUS funding distinctions are irrational and unrelated to any legitimate state interest, and, in turn, unconstitutional.

### C. *CHAMPUS' Summary Judgment Argument*

CHAMPUS makes three substantive arguments in opposition to Britell's motion for summary judgment, and in support of

its own:[17] First, it asserts that Britell's challenge to the constitutionality of 10 U.S.C. § 1093(a) and 32 C.F.R § 199.4(e)(2) fails under *McRae;* second, it suggests that regardless of *McRae,* the challenged provisions easily satisfy rational-basis scrutiny; and third, it impugns the plaintiff's reliance on another federal abortion case, *Karlin v. Foust,* 188 F.3d 446 (7th Cir.1999), in which statutory restrictions were challenged as infringing constitutionally protected liberty interests.

The defendant's arguments regarding *McRae* follow two independent tracks. CHAMPUS first maintains that the *McRae* Court in fact answered the precise question at issue in this case, because in *McRae,* "the Supreme Court was well aware that the Hyde Amendment prohibited the use of Medicaid funds to pay for abortions even where the fetus had a lethal anomaly, such as anencephaly." CHAMPUS then suggests that even if *McRae* does not entirely resolve Britell's question, the decision nevertheless precludes Britell's claims, because, essentially, once statutory language has been upheld in a facial equal protection challenge, the same language is not subject to attack as applied to particular individuals.[18]

Turning to the rationality of the challenged funding provisions, CHAMPUS argues that CHAMPUS' funding distinction between medically necessary pregnancy-related care and medically necessary abortions is rational for the same reason discussed in *McRae:* "Abortion is inherently different from other medical procedures," because the latter does not involve the intentional termination of a fetal life. *McRae,* 448 U.S. at 325, 100 S.Ct. 2671. That an anencephalic fetus' life-interest is ephemeral at best, CHAMPUS argues, does not defeat this reasoning. Some women choose to carry their anencephalic fetuses to term, and some live-born anencephalic infants survive for a period of days or months. Thus, CHAMPUS suggests, Congress could rationally have determined "that aborting such fetuses is immoral and should not be funded by the government." CHAMPUS further maintains that this type of value judgment is precisely the sort of "sensitive ... policy choice[ ]" that should be made by a legislature rather than a court. *Maher,* 432 U.S. at 479, 97 S.Ct. 2376.

CHAMPUS also argues that legitimate state interests justify the second, narrower funding distinction Britell identifies—that between abortion of an anencephalic fetus and termination of an ectopic pregnancy or treatment of a spontaneous, missed, or threatened abortion. CHAMPUS notes that an ectopic pregnancy necessarily threatens the mother's life, and therefore termination of such pregnancies falls within the maternal-health exception incorpo-

---

**17.** The first half of CHAMPUS' motion is devoted to its argument that Britell's constitutional claims are non-justiciable, because her abortion was outside the legal authorization of her physician, so she cannot recover from CHAMPUS regardless of the constitutionality of the Program's funding provisions. As noted above, *supra* note 7, I defer consideration of this argument until a later date.

**18.** CHAMPUS' summary judgment memorandum does not make this precise argument. The memorandum merely suggests that the plaintiff "misconstrues the rational-basis standard," because, "if the lines drawn by a statutory scheme are rational as a general matter, the statutory scheme must be upheld even if the assumptions underlying [it] fail in the particular circumstances of the plaintiff's own case." At the summary judgment hearing before this Court, however, CHAMPUS directly asserted, "the concept of an applied challenge exists only ... where there is a fundamental constitutional right at issue. . . . There is no such thing as an as applied challenge in [an] equal protection case." *Sum. Jgmt. Hrg Transc.* at 29, 33.

rated in 10 U.S.C. § 1093(a). Further, it indicates that "treatment" of spontaneous, missed, or threatened abortions never results in purposeful termination of a potential life. Rather, such treatment involves, respectively, restoring the woman to health after an accidental miscarriage, removing the already dead products of conception, or caring for the woman after a near-miscarriage, to enable her to carry the fetus to term without further incident. These characteristics, CHAMPUS avers, render its decision to fund termination of an ectopic pregnancy and treatment of spontaneous, missed, or threatened abortions entirely rational.

CHAMPUS' final argument in favor of summary judgment relates to Britell's citation of *Karlin v. Foust, supra*, in which the Seventh Circuit struck down certain provisions of a Wisconsin informed-consent statute regulating abortions. CHAMPUS characterizes Britell's reliance on *Karlin* as "misplaced." It argues that the central issue before the Seventh Circuit in *Karlin* was whether the challenged statute infringes the plaintiffs' constitutionally protected liberty interests, not whether the statute violates equal protection, and therefore the standard of review in *Karlin* was stricter than that applicable here.

## III. *ANALYSIS*

### A. *Summary Judgment Standard*

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this context, "material" means that "a contested fact has the potential to change the outcome of the suit ... if the dispute over it is resolved favorably to the nonmovant." *McCarthy v.*

*Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). Similarly, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.*

In ruling on a summary judgment motion, a court views "the facts in the light most favorable to the non-moving party." *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir.1999). Overall, therefore, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Finally, where the non-moving party bears the burden of proof on an issue at trial, the moving party need not produce evidence undermining the non-moving party's case. Instead, the moving party may simply point out to the court the "absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. The question, then, " 'is not whether there is literally no evidence favoring the non-movant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor.' " *Caputo v. Boston Edison Co.*, 924 F.2d 11, 13 (1st Cir.1991) (citing *De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988)).

### B. *The Parties' Summary Judgment Arguments*

Having laid out the summary judgment standard, I now consider each of the parties' summary judgment claims, dispensing first with the defendant's suggestion that *McRae* dictates the outcome here, and

then addressing plaintiff's as-applied constitutional argument.

### 1. McRae's Substantive Holding

■ CHAMPUS makes two arguments regarding *McRae*. First, it maintains that Britell's as-applied challenge is explicitly resolved by the *McRae* Court. In support of this assertion, CHAMPUS points out that the district court opinion in *McRae* specifically considers anencephaly as an example of the sort of fetal abnormality for which abortion funding is unavailable under the Hyde Amendment, *McRae v. Califano*, 491 F.Supp. 630, 679 (E.D.N.Y.), *rev'd sub nom., Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and further, that Justice Marshall's dissenting opinion observes that under the Hyde Amendment, "federal funding is unavailable in cases in which it is known that the fetus ... will suffer an early death if carried to term," *McRae*, 448 U.S. at 339, 100 S.Ct. 2671 (Marshall, J., dissenting).

I cannot accept defendant's premise that these general references to fetal abnormality indicate that the *McRae* Court fully considered the implications of fetal anencephaly. Unlike most other fetal anomalies that do not result in early miscarriage, anencephaly is entirely incompatible with human life. Thus, when the Supreme Court observed that "encouraging childbirth" rather than abortion "is rationally related to the legitimate governmental objective of protecting potential life," it simply cannot have had anencephaly clearly in mind. As I discuss below, if there is some rational reason for proscribing abortion in cases involving anencephaly—as CHAMPUS forcefully argues—that reason cannot be elucidated without more extensive consideration of the issue than was undertaken by the *McRae* Court.

Further, even if the *McRae* Court did specifically consider anencephaly in upholding the Hyde Amendment, there is a significant difference between upholding a statute on its face in spite of its "ragged ... edges," *Baker v. City of Concord*, 916 F.2d 744, 753 (1st Cir.1990), and upholding the same statute in an as-applied challenge to one of those edges. *Cf. Janklow v. Planned Parenthood*, 517 U.S. 1174, 1175, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J.) *denying cert. to Planned Parenthood v. Miller*, 860 F.Supp. 1409 (D.S.D.1995) (noting, in the context of a substantive due process challenge to a South Dakota abortion statute, "the fact that [a legislative] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid" (internal citations omitted)). Thus, the Supreme Court's decision in a facial challenge to the language of the Hyde Amendment simply cannot dictate my decision in an as-applied challenge to the same language in the CHAMPUS provisions.

### 2. Plaintiff's As–Applied Equal Protection Challenge in Light of McRae

■ This conclusion regarding the significance of the *McRae* Court's substantive ruling leads directly into my discussion of the defendant's second argument regarding *McRae*. Apparently, CHAMPUS believes that there is "no such thing as an as-applied challenge in the equal protection" context, and therefore, there is no way for Britell to distinguish her constitutional claims from those addressed in *McRae*. *Sum. Jgmt. Hrg Transc.* at 33. CHAMPUS admits the existence of as-applied constitutional challenges, but it argues such challenges may only be brought in the First Amendment context (or perhaps more broadly in the context of alleged violations of other "fundamental rights"),

not in the context of statutory classifications that are only—allegedly—irrational.

Defendant's characterization of equal protection jurisprudence is simply incorrect. As-applied equal protection challenges have been recognized at least since 1985, when the Supreme Court decided *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *City of Cleburne*, the Court applied rational-basis scrutiny to a Texas city ordinance requiring a special-use permit for the operation of a group home for the mentally retarded. The Court determined that under the Equal Protection Clause, the ordinance is "invalid *as applied*." *Id.* at 435, 105 S.Ct. 3249 (emphasis added). In fact, the Court carefully clarified that its findings were limited to an assessment of the challenged ordinance "in the circumstances" of the case, and that there was "no occasion to decide whether the special use permit provision is facially invalid." *Id.* at 447, 105 S.Ct. 3249.

Additionally, the *City of Cleburne* dissent noted—and objected to—the majority's apparently unprecedented willingness to "treat[ ] an equal protection challenge to a statute on an as-applied basis." *Id.* at 476, 105 S.Ct. 3249 (Marshall, J., dissenting). Justice Marshall observed that prior to *City of Cleburne*, the Court had never left "to the courts the task of redrafting [an invalid or overbroad] statute through an ongoing and cumbersome process of 'as applied' constitutional rulings." *Id.* He argued that this approach might be "defensible ... were the [challenged] ordinance capable of being cleanly severed, in one judicial cut, into its permissible and impermissible applications," but that in the context of *City of Cleburne*, "no readily apparent construction appears, nor has the Court offered one, to define" the circumstances under which the challenged ordi-

nance could constitutionally be applied. *Id.* at 475, 105 S.Ct. 3249.

Since *City of Cleburne*, the Supreme Court and lower federal courts have continued to recognize a distinction between facial and as-applied challenges in the equal protection context. For example, in *Romer v. Evans*, in which the Court used rational-basis scrutiny to strike down a Colorado constitutional amendment that prohibited government action designed to protect homosexuals from discrimination, the dissent objected that even if some provisions of the amendment were invalid, the respondents' *"facial"* challenge to the amendment fell short because the respondents failed to "establish that no set of circumstances exists under which the Act would be valid." 517 U.S. 620, 643, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (Scalia, J., dissenting) (emphasis added). *Accord, e.g., Quinn v. Millsap*, 491 U.S. 95, 103 n. 8, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989) (recognizing the possibility of both facial and as-applied equal protection challenges to a state law that provides that only real property owners can be appointed to a government board); *Williams v. Pryor*, 240 F.3d 944, 951—52 (11th Cir.2001) (distinguishing the "as-applied" equal protection challenge of *City of Cleburne* from the facial, fundamental rights challenge brought by the *Williams* plaintiffs); *Greenspring Racquet Club, Inc. v. Baltimore County, Md.*, 232 F.3d 887, 2000 WL 1624496 *6 (4th Cir.2000) (unpublished disposition) (evaluating both a facial and an as-applied, rational-basis, equal protection challenge to a state zoning ordinance); *Batra v. Board of Regents of Univ. of Neb.* 79 F.3d 717, 721 (8th Cir.1996) ("Most equal protection cases involve *facial or as-applied challenges* to legislative action. Absent a 'suspect classification' such as race, courts review legislative actions under the highly deferential 'rational basis' standard." (emphasis added)); *Steffan v. Per-*

*ry*, 41 F.3d 677, 693 (D.C.Cir.1994) (evaluating a rational-basis, equal protection challenge to a DOD directive that prohibits homosexuals from serving in the Navy, and observing that "where . . . a statute or regulation has some concededly constitutional applications, a successful challenger must demonstrate that the statute is unconstitutional *as 'applied* to the particular facts of [his] case.' ") (emphasis added) (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).[19] These cases clearly establish that federal courts are generally willing to entertain as-applied equal protection challenges.

Nevertheless, CHAMPUS argues, with considerable case-law support, that legislative line-drawing is necessarily inexact, and therefore this Court should not reject Congress and the CHAMPUS regulators' funding choices just because the chosen funding categories may seem "ragged around the edges." *Baker v. City of Concord*, 916 F.2d at 753. That is,

> [C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "is not made with mathematical nicety or because in practice it results in some inequality." . . . "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

*Heller v. Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citing *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Metrop-*

*olis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913)).

While I fully appreciate CHAMPUS' plea regarding the importance of judicial deference to legislative choices, I do not think the argument necessarily carries the day. To begin with, CHAMPUS cites several cases that discuss facial, rather than as-applied, challenges to legislative line drawing. In such cases, there is a strong sense that a court should defer to the legislature's choice, and therefore, "the fact that [the challenged legislative] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Janklow*, 517 U.S. at 1175, 116 S.Ct. 1582. In plaintiff's as-applied challenge, the bar is necessarily lower—all Britell must do is show that the challenged provisions operate unconstitutionally as applied to her situation. *Id.* ("[A] facial challenge may be more difficult to mount than an as-applied challenge.").

Further, many of the cases CHAMPUS cites involve legislative funding decisions in the face of "finite" funds that cannot be stretched to meet the needs of all constituents. *E.g. Baker v. City of Concord*, 916 F.2d at 753 ("Having determined that the financial assistance . . . is finite and cannot meet the full standard of need in all cases, the legislature was entitled to decide in whatever rational way it preferred which categorical grant recipients could be expected to bear the hardships of an inadequate standard of living."). In such cases, holding any particular funding alternative unconstitutional under the Equal Protection Clause would simply shift the burden

---

19. Using similar reasoning, although not the words "facial" or "as applied," the Supreme Court recently held that the Equal Protection Clause can give rise to a cause of action on behalf of a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). Britell is not in precisely this situation, however, as the statute and regulation she challenges would also apply to any other woman insured by CHAMPUS who chose to abort an anencephalic fetus.

of inadequate funds to other constituents, so the argument is strong that a court should defer to the original legislative choice.

In this case, however, the evidence indicates that Britell's decision to terminate her pregnancy resulted in a net cost *savings*, as the costs associated with carrying her anencephalic fetus to term would almost undoubtedly have exceeded the costs of the abortion. Stubblefield Aff. at ¶ 26. Further, the latter, higher costs *would* have been covered by CHAMPUS. Under these circumstances, there is less reason to defer to legislative line-drawing, as Britell alone bears the burden of the CHAMPUS funding restrictions, and there is no suggestion that removing that burden from her shoulders would shift it directly to those of another constituent.

Finally, I note that in this case, the plaintiff challenges a discrete and easily severable part of the CHAMPUS funding restrictions. Judgment in Britell's favor would simply require that this Court (1) excise the parenthetical "(e.g. anencephalic)" from 32 C.F.R. § 199.4(e)(2), and (2) declare that 10 U.S.C. § 1093(a) may not be interpreted to proscribe funding for abortions in cases of fetal anencephaly. The simplicity of this remedy thus distinguishes this case from both *City of Cleburne*, in which Justice Marshall objected so strongly to the majority's as-applied analysis, and *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), on which CHAMPUS pins its argument regarding deference to legislative decision-making. *City of Cleburne*, 473 U.S. at 475, 105 S.Ct. 3249 (Marshall, J., dissenting) ("The Court's as-applied approach might be more defensible [if the challenged ordinance] ... were ... capable of being

cleanly severed ... into its permissible and impermissible applications."); *Vance*, 440 U.S. at 108, 99 S.Ct. 939 (accepting the "imperfection [in the challenged statute] because it is ... rationally related to the secondary objective of legislative convenience," particularly given the "many different purposes" that must be served by the Foreign Service and Civil Service retirement packages).

I therefore conclude both that there is "such thing" as an as-applied equal protection challenge, and that Britell's claims are of a type well-suited to such as-applied evaluation. Whether Britell ultimately prevails, however, remains to be seen.

### C. *Evaluation of Britell's Claims*

As noted above, Britell identifies two CHAMPUS funding distinctions that she alleges fail rational-basis scrutiny. I address each in turn.

### 1. *The Broad Distinction Between Medically Necessary Pregnancy Services and the Medically Necessary Abortion of an Anencephalic Fetus*

■ As Britell and her experts repeatedly emphasize, anencephaly is uniformly fatal to a fetus, and there is no medical procedure to correct the condition.[20] Under CHAMPUS' policy, an insured pregnant woman who learns that her fetus is anencephalic is forced not only to confront the tragic news that the baby cannot and will not survive more than a few weeks after birth, but also to decide between the significant physical and emotional side effects of carrying the fetus to term and the significant monetary expense of terminating the pregnancy.

---

**20.** Or, as one expert poetically observed, "[t]he brain is an organ that is necessary for human existence." Bennett Aff. at ¶ 15.

It is difficult to conceive of a legitimate state interest, let alone a rational one, that is advanced by insuring one side of this heartbreaking Hobson's choice, but not the other. Given that both the costs and the risks of an anencephalic pregnancy rise with time, while the fetus' chances of survival remain at zero, why would the state wish to "encourage" a pregnant woman to carry an anencephalic fetus to term?

Further, there is some legal precedent for the proposition that encouraging the continuation of anencephalic pregnancies furthers no legitimate state interest. As Britell notes, in *Karlin,* the Seventh Circuit paused in the middle of a lengthy discussion of a facial challenge to the constitutionality of a Wisconsin informed consent statute to note that in cases involving lethal fetal anomalies, in which "the child will die at birth,"

> [T]he mandatory provision of information relating to a father's child support obligations and the availability of state childrearing assistance serves no legitimate state interest and makes little sense.... We fail to see how the provision of this largely irrelevant information helps a woman "facilitate the wise exercise of [her abortion] right."

188 F.3d at 489 n. 16 (citing *Planned Parenthood of Southeastern Penn. v. Casey,* 505 U.S. 833, 887, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). The *Karlin* court thus specifically rejected the notion that the Wisconsin statute's information requirements—intended under normal circumstances to encourage a woman to carry her baby to term—would forward any "legitimate purpose" in cases involving lethal anomaly.

Additionally, contrary to CHAMPUS' assertions, the Seventh Circuit reached this finding under precisely the same rational-basis standard applicable here. CHAMPUS correctly notes that the *Kar-*

*lin* case generally addressed allegations that the Wisconsin statute violates substantive constitutional rights. The above-cited findings, however, are independently grounded in the *Karlin* court's conclusion that the statute's information requirements fail rational-basis scrutiny as applied to cases involving anencephaly and other lethal anomalies. In fact, although the district court in *Karlin* decided to strike down "the mandatory provision of ... information" in cases involving lethal anomaly on grounds that the mandate would "cause a woman in such a situation severe mental harm"—a finding requiring some higher level of scrutiny—the Seventh Circuit went out of its way to clarify that it reached the decision for the simple reason that the mandate "furthers no legitimate purpose"—a finding requiring only rational-basis scrutiny.

■ Clearly, therefore, CHAMPUS cannot defend its position regarding funding for termination of an anencephalic pregnancy simply by pointing to the state's interest in preserving "potential life." As an alternative, CHAMPUS suggests that the distinction can be justified in purely moral terms: Since some women choose to carry their anencephalic fetuses to term, Congress could rationally have decided that aborting such fetuses is "immoral" and should not be funded by the government.

On the record now before me, I am reluctant to decide whether this alternative "moral" justification for CHAMPUS' funding regime satisfies rational-basis scrutiny. The parties' current filings only cursorily address this issue, in part because CHAMPUS mistakenly assumed that Britell's as-applied challenge was entirely governed by the Supreme Court's holding in *McRae,* and in part because Britell focused her summary judgment arguments on the narrower distinction between CHAMPUS'

handling of anencephalic pregnancies and its handling of ectopic pregnancies and spontaneous, missed, or threatened abortions.[21] Therefore, resolution of this issue is deferred pending further briefing.

### 2. *The Narrower Distinction Between Abortion of an Anencephalic Fetus and Termination of an Ectopic Pregnancy or Treatment of a Spontaneous, Missed, or Threatened Abortion*

■ Though not dispositive, this memorandum and order does foreclose further discussion of the second, narrower funding distinction that Britell identifies in support of her claims. Britell questions the Program's differential handling of (1) anencephalic pregnancies and (2) ectopic pregnancies and spontaneous, missed, or threatened abortions. I agree with CHAMPUS that the decision to fund treatment of the latter conditions advances the state interests identified in *McRae* and *Roe v. Wade.*

First, I note that termination of an ectopic pregnancy and termination of an anencephalic pregnancy are constitutionally distinguishable. As · Britell herself acknowledges, an ectopic pregnancy threat-

ens a woman's life.[22] Stubblefield Dep. at 20—21; Sum. Jgmt. Hrg Transc. at 19. In contrast, although an anencephalic pregnancy has numerous, tragic, physical and psychological side effects, the plaintiff's own expert indicates that such a pregnancy is not necessarily life threatening. Stubblefield Dep. at 11—12. Thus, the legitimate state interest in preserving maternal health justifies CHAMPUS' decision to distinguish between termination of an ectopic pregnancy and treatment of other non-life-threatening conditions (including termination of an anencephalic pregnancy).[23]

■ A different rationale supports CHAMPUS' decision to fund treatment of spontaneous, missed, or threatened abortions: In these cases, CHAMPUS does not fund termination of the pregnancy at all; it only funds *treatment* of the pregnant woman—to restore the woman to full reproductive health, to remove the *already dead* products of conception, or to improve the chances that the fetus can be carried to term without further incident, respectively.[24] The state's legitimate interest in preserving maternal health and protecting potential life therefore justify CHAMPUS'

21. As noted below, Britell apparently focused her arguments in this way because she misunderstood CHAMPUS' policy regarding spontaneous, missed, or threatened abortions. *Infra* note 23.

22. It is this characteristic that brings ectopic pregnancies within the statutory exception detailed in 10 U.S.C. § 1093(a): "Funds available to the Department of Defense may not be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

23. To be sure, the Stubblefield affidavit suggests that the difference between anencephalic pregnancies and ectopic pregnancies may be one of degree, not kind, in that both conditions pose some risk to the mother. Further, anencephalic pregnancies only increase in risk over time, and they may ultimately

threaten the mother's life. Nevertheless, the distinction between a growing risk to a mother's health and an imminent danger to mother's health is one that the medical profession, and the plaintiff's expert, apparently concede. Stubblefield Dep. at 20—21.

24. Britell's claim regarding CHAMPUS' policy toward these conditions apparently rests on her mistaken belief that CHAMPUS covers termination of the pregnancy in cases involving missed or threatened abortions. For example, she argues that the "irrationality of [CHAMPUS'] failure ... to cover Plaintiff's abortions is only magnified by the fact that CHAMPUS covers all 'threatened abortions' " even though a threatened abortion does not necessarily result in the death of the fetus.

decision to fund treatment of these conditions, despite its refusal to fund other "abortions."

Britell cannot satisfy the rational-basis equal protection standard by comparing one "ragged edge" of the CHAMPUS funding regime (the exclusion of funding for termination of anencephalic pregnancies) to another (the allowance of funding for termination of ectopic pregnancies or for treatment of spontaneous, missed, or threatened abortions). Rather, she must look to the broader funding scheme, of which these specific rules are a part. As CHAMPUS itself notes, perfectly rational funding schemes may have ragged edges that cannot be justified in isolation. The converse is also true: The phenomenon known in economics as the "tyranny of small decisions" [25] well illustrates that one can assemble an irrational or illegitimate—and hence unconstitutional—funding scheme by making a series of perfectly rational, small funding choices.

Thus, a successful as-applied equal protection challenge to the CHAMPUS funding regime must demonstrate not that the regime applies differently in slightly different situations, but rather that the regime's treatment of a particular situation fails to further any legitimate state interest. The CHAMPUS regulators' narrow decision to *allow* funding for termination of ectopic pregnancies, and for treatment of spontaneous, missed, or threatened abortions, is eminently justified by the specific characteristics of those conditions. It is the broader decision to excise termination of an anencephalic pregnancy from the universe of fully-funded pregnancy-related care—seemingly in the name of "potential life"—that is far more troubling.

## IV. CONCLUSION

In conclusion, I briefly summarize the holdings of this opinion and the remaining issues in this case:

1. I find that an as-applied challenge to CHAMPUS' funding regulations is entirely appropriate and is not precluded by the Supreme Court's holding in *McRae;*

2. I further hold that CHAMPUS' decision to fund termination of ectopic pregnancies and treatment of spontaneous, missed, or threatened abortions is rationally related to the legitimate state objectives of preserving maternal health and protecting potential life;

3. Significant questions of law remain, however, regarding the state interest advanced by denying funding for termination of anencephalic pregnancies, while allowing funding for other medically necessary pregnancy services: (1) Does CHAMPUS' "moral" justification for its funding scheme satisfy the equal protection standard? and (2) If not, does some other, as-yet-unidentified state interest justify that scheme?

4. Finally, questions of fact remain regarding the age of Britell's fetus at the time of the abortion, and the implications of that age for CHAMPUS' funding decisions.

In accordance with these findings, the parties' summary judgment motions [docket entries ##17 and 29] are **DEFERRED PENDING FURTHER BRIEFING.** The parties are directed to submit supplemental briefs that focus narrowly on any plausible rationale for refusing to fund termination of an anencephalic pregnancy while funding other medically necessary

---

**25.** Alfred E. Kahn, *The Tyranny of Small Decisions: Market Failures, Imperfections, and the* *Limits of Economics,* 19 Kyklos: Int'l Rev. Soc. Sci. 23 (1966).

pregnancy-related care.[26]  Plaintiff is to submit her supplemental brief by **Wednesday, June 6, 2001.**  Defendant is to submit its response **within fifteen days after the submission of plaintiff's brief.**

**SO ORDERED.**

---

**26.**  Britell is also welcome to revisit the administrative law issues raised in her second amended complaint.  If she does not, that issue will be deemed waived.