**Maureen M. BRITELL, Plaintiff,**

**v.**

**UNITED STATES of America.**

**No. CIV.99–11253–NG.**

United States District Court,
D. Massachusetts.

May 29, 2002.

John H. Henn, Foley, Hoag & Eliot, Boston, MA, for Plaintiff.

Vincent M. Garvey, Department of Justice, Jean Lin, Department of Justice, Washington, DC, for Defendants.

### *TABLE OF CONTENTS*

### *MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT*

GERTNER, District Judge.

### TABLE OF CONTENTS

I.  INTRODUCTION .................................................183

II.  FACTUAL BACKGROUND ...........................................185
    A.  Anencephaly ...............................................185
    B.  Britell's Abortion .........................................186
    C.  CHAMPUS' Coverage .......................................186

III.  PRIOR PROCEEDINGS ...........................................186
    A.  An As–Applied Equal Protection Challenge May Be Brought in This
        Case .....................................................187
    B.  Coverage of the Termination of Ectopic Pregnancies and the Treatment
        of Spontaneous, Missed, or Threatened Abortions .........................188

IV.  ANALYSIS .....................................................188
    A.  Summary Judgment Standard .....................................188
    B.  The Significance of McRae .......................................189
    C.  The As–Applied Challenge .......................................190
        1.  The Justification: Potential Life .................................190
            a.  Medical Status of Anencephaly .............................190
            b.  Legal Status of Anencephaly ...............................191
            c.  Case Law .............................................192
        2.  The Moral Interest in Preserving Life .............................193
        3.  Legislative Deference in Funding Cases ............................195
        4.  Whether "Invidious" Discrimination is Involved .....................196
        5.  Whether Allowing Insurance Coverage Here Raises the Specter of the
            "Slippery Slope" .........................................197

V.  CONCLUSION ...................................................198

## I.  INTRODUCTION

In January of 1994, Maureen M. Britell ("Britell") and her husband, a Captain in the Air National Guard, were happily anticipating the birth of their second child. A routine checkup with her doctor, however, revealed horrific news: The fetus was anencephalic. It had no forebrain or cranium, and no chance of survival outside the womb. It had no capacity for consciousness. No medical procedure could correct anencephaly. Indeed, because of the fetus' condition, the pregnancy would have to be terminated artificially, through an abortion in its early stages or by inducing birth at term. Either way, the fetus would die.

On the advice of her doctors and even her parish priest, Britell chose to undergo an abortion in February of 1994. Britell sought to have the abortion paid for by her husband's insurer, the Civilian Health and Medical Program of the Uniformed Service ("CHAMPUS" or "the Program"). CHAMPUS denied the claim. While CHAMPUS funds all medically necessary services in connection with pregnancy, it treats one medically necessary service—abortion—differently. Abortions are only covered when the life of the mother would be endangered if the fetus were carried to term. Abortions performed because of "fetal abnormalit[ies]"—anencephaly was mentioned explicitly—are excluded. 32 C.F.R. § 199.4(e)(2).

Britell filed this action, claiming that the statute[1] and implementing regulations governing CHAMPUS' coverage of abortions, as they are applied to her, violate

---

**1.** 10 U.S.C. § 1093(a) provides: "(a) Restric-

tion on use of funds—Funds available to the

the Due Process Clause of the Fifth Amendment. Recognizing that the Supreme Court's decision in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), resolved the facial constitutionality of a statute analogous to the statute at issue here,[2] Britell's challenge is a narrow one: She challenges neither the Supreme Court's determination that broad abortion funding restrictions are constitutional provided they survive rational-basis scrutiny, *id.* at 323, 100 S.Ct. 2671, nor its determination of the two most common state objectives for regulating abortion— preserving a woman's health and protecting a potential human life. *Roe v. Wade*, 410 U.S. 113, 162, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Rather, Britell alleges that CHAMPUS' regulations are unconstitutional *as applied to her* because denying funding for an abortion of an anencephalic fetus—one with no "potential life" or, indeed, consciousness—advances none of the legitimate state interests identified in *McRae*.

CHAMPUS argues first, that there is no such thing as an "as applied" equal protection challenge to a statute whose facial constitutionality has been sustained. In any case, CHAMPUS argues that the denial of funding in Britell's case is rational for the same reason discussed in *McRae* and *Roe:* Abortion is different from other medically necessary procedures because the latter do not involve the intentional termination of fetal life. *McRae*, 448 U.S. at 325, 100 S.Ct. 2671. The state can use

its funding power to encourage childbirth, and encouraging childbirth is rationally related to the state's interest in potential life. Alternatively, even if the anencephalic fetus' life interest is ephemeral, and not a "potential life" within the meaning of *McRae*, CHAMPUS argues that the regulation is still constitutional. It is rationally related to the state's interest in encouraging women to make the "moral" choice— avoiding abortion at all cost. These justifications—"potential life" and "morality"— must be upheld because they are not motivated by invidious discrimination, the only limit imposed by a rational basis review. Moreover, to find an anencephalic fetus' short life not worth protecting, CHAMPUS argues, is to "start down a slippery slope" not warranted by the constitutional standards.

After substantial briefing, this complex issue is finally joined. It is clear from the outset that the Britells' situation was tragic—a horrifying diagnosis, the termination of a wanted pregnancy. And it is also clear that their tragedy was compounded by CHAMPUS' denial of coverage. Should Britell carry the pregnancy to term and then artificially induce birth—a normal "birth" was unlikely—producing an infant who would not survive? If she did, CHAMPUS would pay, but Britell would have to bear unimaginable emotional pain and the growing risks to her health as the pregnancy progressed. Or should she terminate the pregnancy early, having an abortion which also meant the death of the

Department of Defense may not be used to perform abortions except where the life of the mother would be endangered if the fetus is carried to term."

**2.** *McRae* involved a statute that prohibited the use of any federal funds to reimburse the cost of abortions under the Medicaid program "except where the life of the mother would be endangered if the fetus were carried to term."

448 U.S. at 325 n. 27, 100 S.Ct. 2671. *See also* Pub.L. No. 94–349, 209, 90 Stat. 1434.

Over time, Congress has employed several versions of the Hyde Amendment. *McRae*, 448 U.S. at 302–03, 100 S.Ct. 2671. The Supreme Court specifically chose to consider the constitutionality of the most restrictive version, because "[i]f [this] version is constitutionally valid, so too are the others." *Id.* 448 at 325 n. 27, 100 S.Ct. 2671.

fetus? Then she would have the bear the substantial costs of the procedure, added to the already excruciating pain of her loss, but she would avoid risks to her own health.

Put in constitutional terms, is there a legitimate state interest, let alone a rational one, that is advanced by insuring one side of this heartbreaking Hobson's choice, but not the other? Since both the costs and the risks of an anencephalic pregnancy rise with time, while the fetus' chances of survival remain at zero throughout, why would the state wish to "encourage" a pregnant woman to carry an anencephalic fetus to term?

I have concluded that there is no rational, legitimate state interest in denying coverage under these circumstances. For the reasons discussed below, Britell's motion for summary judgment [docket entry # 17] is **GRANTED**, and CHAMPUS' motion for summary judgment [docket entry # 29] is **DENIED**.

## II. *FACTUAL BACKGROUND*

### A. *Anencephaly* [3]

Anencephaly is a neural tube defect in which the fetus develops without a forebrain, cerebellum, or cranium. In place of the brain and skull, the crown of the head is covered by a gelatinous tissue. The condition is uniformly fatal. Most anencephalic fetuses die during pregnancy or birth. Thirty-two percent of anencephalic fetuses carried to term are born alive, but without any hope of survival. With continuous life support and intensive neonatal care, some anencephalic infants can live up to two months.

Without such care, however, fewer than two percent survive longer than seven days. Moreover, because anencephalics do not possess a cerebrum, they are permanently unconscious. They can never experience consciousness or sensory perception of any kind. There is no medical procedure, such as a brain transplant, that can save the life of an anencephalic fetus.

Women who carry anencephalic fetuses to term suffer heightened physical and psychological health risks. In late pregnancy, these women create excessive amniotic fluid, which increases the risk of placental abruption (premature separation of the placenta from the uterine wall). Placental abruption, in turn, can cause disseminated intravascular coagulopathy (abnormally accelerated blood clotting, with simultaneous uncontrolled bleeding), placing the woman at grave risk.

Anencephalic pregnancies are highly likely to require artificial termination, regardless of whether they are carried to term, because an anencephalic fetus has an abnormally small adrenal gland. Adrenal secretions play a key role in triggering spontaneous labor. If delivery is not induced, and pregnancies involving anencephalic fetuses are allowed to continue after the normal nine-month period,[4] the health risks associated with late-term pregnancy, including possible liver or kidney failure, blood clots, and hemorrhaging, are exacerbated.[5] And the emotional cost cannot be

---

**3.** These findings summarize those recited in my earlier decision, *Britell v. United States*, 150 F.Supp.2d 211, 213 (D.Mass.2001) (hereinafter *Britell I* ).

**4.** In one well-documented case, an anencephalic pregnancy lasted for one year and twenty-four days. However, it is against community standards of medicine to allow an anencephalic pregnancy to progress beyond nine months.

**5.** Moreover, inducing labor is not always successful. When induction fails, a cesarean section is performed, which is a riskier alternative than a vaginal birth.

minimized—the severe psychological stress generated by knowingly carrying a non-viable fetus to term.

## B. *Britell's Abortion*

Britell was approximately twenty weeks pregnant when her doctor determined her fetus was anencephalic. The diagnosis was confirmed by a second ultrasound.

The Britells were devastated. They consulted grief counselors, psychiatrists, medical doctors, and their parish priest. The advice was consistent from all quarters: Terminate the pregnancy as soon as possible. Ultimately, the Britells agreed. On February 18, 1994, physicians at New England Medical Center ("NEMC") administered medication to induce labor. Britell was in labor for thirteen hours, in immense physical pain and emotionally distraught. The fetus died during delivery. The diagnosis of anencephaly was confirmed.

## C. *CHAMPUS' Coverage*

Britell was insured through CHAMPUS, a program established to "provid[e] an improved and uniform program of medical and dental care for members ... of [the uniformed] services, and for their dependents." 10 U.S.C. § 1071.[6]

CHAMPUS funds all "medically necessary services and supplies associated with maternity care," 32 C.F.R. § 199.4(e)(16)(i). But a statute, 10 U.S.C.

6. CHAMPUS is funded through annual congressional appropriations to the Department of Defense ("DOD"). 32 C.F.R. § 199.1(e).

7. *See supra* n. 2.

8. CHAMPUS denied coverage of $4,507.05, the majority of NEMC's claim. CHAMPUS did, however, cover some of the costs associated with an emergency surgical procedure that Britell underwent after delivery to remove the placenta.

§ 1093(a), analogous to the one at issue in *McRae,*[7] prohibits the program from using funds "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." Indeed, going beyond the explicit language of the statute, regulations governing CHAMPUS single out anencephalic fetuses:

> Covered abortion services are limited to medical services and supplies only. Physician certification is required attesting that the abortion was performed because the mother's life would be endangered if the fetus were carried to term. *Abortions performed for suspected or confirmed fetal abnormality (e.g., anencephalic) ... do not fall within the exceptions permitted within the language of the statute and are not authorized for payment under CHAMPUS.*

32 C.F.R. § 199.4(e)(2) (emphasis added).

Following Britell's abortion, NEMC submitted a claim to CHAMPUS, but CHAMPUS refused to cover most of the associated costs.[8] NEMC then filed suit against the Britells, seeking an award of almost $5,000.00. The Britells have since settled their suit with NEMC for $4,000.00. Britell brings this action to recover the costs paid to NEMC.

## III. *PRIOR PROCEEDINGS*

Several preliminary matters were addressed during the course of this litigation,[9] culminating in joint motions for sum-

9. There have been multiple waves of briefing in this case: The government moved for judgment on the pleadings, on the grounds that under Massachusetts law, the plaintiff's abortion was outside the scope of the legal authorization of her physicians, as the fetus was 25 weeks old at the time of the abortion. The parties have since stipulated that the government will not contest that Britell's fetus was 20 weeks old at the time of the abortion. This issue is now moot.

mary judgment.[10] I resolved some of the issues raised by these motions in my opinion in *Britell I.* I summarize those findings here:

### A. *An As–Applied Equal Protection Challenge May Be Brought in This Case*

In *Britell I,* I rejected CHAMPUS' argument that there is "no such thing" as an as-applied challenge in the equal protection context. As-applied equal protection challenges have been recognized at least since 1985, when the Supreme Court decided *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). I stated:

> In *City of Cleburne,* the Court applied rational-basis scrutiny to a Texas city ordinance requiring a special use permit for the operation of a group home for the mentally retarded. The Court determined that under the Equal Protection Clause, the ordinance is "invalid *as applied.*" *Id.* at 435, 105 S.Ct. 3249. (emphasis added). In fact, the Court carefully clarified that its findings were limited to an assessment of the challenged ordinance "in the circumstances" of the case, and that there was "no occasion to decide whether the special use permit provision is facially invalid." *Id.* at 447, 105 S.Ct. 3249. Additionally, the *City of Cleburne* dissent noted—and objected to—the majority's apparently unprecedented willingness to "treat[ ] an equal protection challenge to a statute on an as-applied basis." *Id.* at 476, 105 S.Ct. 3249 (Marshall, J., dissenting.) Justice Marshall observed that prior to *City of Cleburne,* the Court had never left "to the courts the task of redrafting [an invalid or overbroad] statute through an ongoing and cumbersome process of 'as applied' constitutional rulings." *Id.*

*Britell I* at 221.

Nevertheless, I recognized the limitations of the as-applied approach. Legislative line-drawing is necessarily inexact. *Britell I* at 222. The problems of government are, after all, "practical one[s]" which "may justify, if they do not require, rough accommodations." *Heller v. Doe,* 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citing *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and *Metropolis Theater Co. v. Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913)). This Court may not reject Congress' and the CHAMPUS regulators' funding choices just because the chosen funding categories may seem, as one court noted, "ragged around the edges." *Baker v. City of Concord,* 916 F.2d 744, 753 (1st Cir.1990).

In fact, in my earlier decision, I concluded that some of the challenged CHAMPUS provisions satisfied constitutional standards. Britell identified two CHAMPUS

---

In addition, I asked the parties to address issues of standing and exhaustion of administrative remedies. I am now satisfied that this action is properly before me. As defendant apparently concedes, CHAMPUS denied coverage of Britell's abortion because "voluntary termination of pregnancy is not a CHAMPUS benefit unless abortion is performed due to a life threatening condition to the mother," and not for any other administrative reason. Further, under 32 C.F.R. § 199.10(a), Britell may not challenge the constitutionality of the CHAMPUS policy through an administrative appeal, so any attempt to seek administrative redress for CHAMPUS' denial of funding would have been futile.

**10.** Britell also claims that the implementing regulation is arbitrary and capricious and outside the defendant's regulatory authority, apparently under the Administrative Procedures Act, 5 U.S.C. § 706. The parties' subsequent filings do not address this claim, however, and I will not address it here.

funding distinctions as allegedly irrational as applied to her. The first is the broad funding distinction between (1) medically necessary pregnancy-related care (which is funded) and (2) a medically necessary abortion of an anencephalic fetus (which is not). The second is the narrower distinction between (1) termination of an ectopic pregnancy or treatment of spontaneous, missed, or threatened abortion (which is funded) and (2) an abortion of an anencephalic fetus (which is not). I specifically affirmed the second distinction.

### B. Coverage of the Termination of Ectopic Pregnancies and the Treatment of Spontaneous, Missed, or Threatened Abortions

CHAMPUS regulations cover treatment for "spontaneous,"[11] "missed,"[12] or "threatened"[13] abortions, as well as for the termination of an ectopic pregnancy.[14] 32 C.F.R. § 199.2(b). The covered conditions are constitutionally distinguishable from anencephaly. Ectopic pregnancy poses an imminent danger to the woman's life, while anencephaly, at least at first, does not.[15] The treatment of spontaneous, missed, or

threatened abortion involves the use of funds to restore the woman to full reproductive health or to remove the already dead products of conception. These procedures do not involve terminating the pregnancy. *Britell I* at 225–26. As such, I concluded that they are rational within the context of a facially valid scheme intended to encourage pregnancy and, in so doing, to foster "potential life."

The "more troubling" decision, I noted, was the broader one: Excluding from coverage the early termination of an anencephalic pregnancy by abortion (rather than the later termination by inducing birth) in the name of "potential life" or, more generally, "morality." *Id.* at 225.[16] I now turn to this issue.

## IV. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

---

**11.** A spontaneous abortion is a miscarriage. It occurs when a fetus dies in utero and is naturally expelled.

**12.** A missed abortion occurs when a fetus dies in utero and the dead products of conception are retained in the uterus for several weeks. Although many missed abortions are naturally expelled, doctors often advise patients to abort the already dead fetus, to reduce the risk of infection and the psychological repercussions of carrying a dead fetus.

**13.** A threatened abortion occurs when a woman experiences some symptoms of miscarriage during the first trimester, but does not lose the fetus.

**14.** Ectopic pregnancy involves the implantation of a fertilized egg anywhere other than the uterus.

**15.** Ectopic pregnancies are always life-threatening to the mother, although the difference

between ectopic and anencephalic pregnancies may be one of degree, not kind. The risk to the mother of an anencephalic pregnancy increases over time, and may ultimately threaten the mother's life. Nevertheless, the distinction between a growing risk to a mother's health, as with anencephalic pregnancy, and an imminent danger to a mother's health, as with an ectopic pregnancy, is one that the medical profession, and the plaintiff's expert, apparently adopt.

**16.** In my previous decision, I gave the parties an opportunity to brief this issue more extensively. I framed it as follows: Even if the failure to fund abortion of an anencephalic fetus was not rational—because it did not involve potential or even conscious life—was it still possible to justify the policy on moral grounds?

al fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Given the record in this case, and the absence of any dispute concerning a material fact, summary judgment is appropriate.

## B. *The Significance of McRae*

■ In a 5–4 decision, the Supreme Court in *McRae* held that the Hyde Amendment to Title XIX of the Social Security Act, which prohibited Medicaid funding for certain medically necessary abortions, was constitutional. As noted above, the version of the Hyde Amendment at issue in *McRae* only allowed funding for abortions "where the life of the mother would be endangered if the fetus were carried to term." *Id.* at 325 n. 27, 100 S.Ct. 2671; *see also* Pub.L. No. 94–439, 209, 90 Stat. 1434. The *McRae* appellees argued, *inter alia,* that the Hyde Amendment violated the equal protection component of the Fifth Amendment because it provided reimbursement for "medically necessary services generally" but not for medically necessary abortions. *McRae,* 448 U.S. at 306, 100 S.Ct. 2671.

When the Court concluded that the classification created by the Hyde Amendment implicated neither a fundamental right nor a suspect classification,[17] it focused on whether the Amendment's distinction between medically necessary abortions and all other medically necessary procedures was "rationally related to a legitimate governmental objective" (the "rational basis test" or "rational basis scrutiny"). 448 U.S. at 324, 100 S.Ct. 2671. The *McRae* Court answered this question in the affirmative. Abortion was different from other medically necessary procedures because it

involved the intentional termination of fetal life. *Id.* at 325, 100 S.Ct. 2671. In subsidizing the medical expenses of indigent women who choose to carry their pregnancies to term while declining to do so for those who undergo abortions (except where their lives are threatened), Congress had simply created incentives to make childbirth a more attractive alternative than abortion—a policy rationally related to protecting potential life. *Id.*

CHAMPUS argues that *McRae* is determinative of all the issues here. It points out that the district court decision in *McRae* referred to anencephaly as a type of fetal abnormality for which the Hyde Amendment prohibits abortion funding. *McRae v. Califano,* 491 F.Supp. 630, 679 (E.D.N.Y.1980). The Supreme Court's decision implicitly adopts this view of the sweep of the provision. Indeed, Justice Marshall, in his dissent, observed that funding would be unavailable in cases where "it is known that the fetus ... will suffer an early death if carried to term." *McRae,* 448 U.S. at 339, 100 S.Ct. 2671 (Marshall, J., dissenting).

I resolved this issue in *Britell I.* The references to anencephaly in the *McRae* dissent and lower court opinion were hardly enough to establish that the Court was "well aware" of all the implications of fetal anencephaly, as CHAMPUS suggests. Anencephaly is not just a fetal defect that results in "early death," as Justice Marshall's dissent describes. It is a condition that is fundamentally incompatible with both life and consciousness. Nor is there any indication that the Justices considered anencephaly specifically in finding that "encouraging childbirth" rather than abortion is "rationally related to the legitimate

---

17. Because the Hyde Amendment withheld funding for abortion, rather than prohibiting it, the *McRae* court found no violation of *Roe v. Wade. Id.* at 318–19, 100 S.Ct. 2671. And even though the Amendment "only" impacted indigent women, the court found no suspect classification. "[F]inancial need alone" was not sufficient. *Id.* at 323, 100 S.Ct. 2671.

governmental objective of protecting potential life." *Britell I* at 220.

In any event, *McRae* must be put in context. It was a *facial* challenge to the statute. With a facial challenge, the fact that an "act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Britell I* at 220 (citing *Janklow v. Planned Parenthood*, 517 U.S. 1174, 1175, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J.), *denying cert. to Planned Parenthood v. Miller*, 860 F.Supp. 1409 (D.S.D.1994)). With an as-applied challenge, however, "the bar is necessarily lower": Britell has to show that the challenged provision operates unconstitutionally as applied to her. *Britell I* at 222 (citing *Janklow*, 517 U.S. at 1175, 116 S.Ct. 1582) ("[A] facial challenge may be more difficult to mount than an as-applied challenge").

I noted that this is particularly so where, as here, a plaintiff challenges a discrete and easily severable part of the CHAMPUS funding restrictions. Judgment in Britell's favor would simply require that this Court (1) excise the parenthetical "(e.g. anencephalic)" from 32 C.F.R. § 199.4(e)(2), and (2) declare that 10 U.S.C. § 1093(a) may not be interpreted to proscribe funding for abortions in cases of fetal anencephaly. *See Cleburne*,

473 U.S. at 475, 105 S.Ct. 3249 (Marshall, J., dissenting) ("The Court's as-applied approach might be more defensible [if the challenged ordinance were] capable of being cleanly severed ... into its permissible and impermissible applications").[18]

## C. The As–Applied Challenge

■ The standard of scrutiny that applies in this case, as in *McRae*, is the most forgiving: rational basis review. Within that paradigm, Britell advances two principal arguments in favor of summary judgment: First, that there is no rational basis for distinguishing between the funding of medically necessary pregnancy services generally and that of a medically necessary abortion of an anencephalic fetus; and, second, that a "bare" morality-based justification, articulated solely after the fact, cannot serve as a rational basis for legislative action.

While I concluded in *Britell I* that there was no rational basis for the exclusion from coverage of anencephalic pregnancies, I summarize and augment those findings here, in addition to addressing CHAMPUS' morality-based justification. *See Britell I*, at 222–223.

### 1. The Justification: Potential Life
### a. Medical Status of Anencephaly

From a medical standpoint, it is difficult to characterize an anencephalic fetus as

---

**18.** This theme is repeated in *Vance v. Bradley*, 440 U.S. 93, 109, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), which is cited by CHAMPUS. The Court notes that it is accepting the "imperfection [in the challenged statute] because it is ... rationally related to the secondary objective of legislative convenience," particularly given the "many different purposes" that must be served by the Foreign Service and Civil Service retirement packages. In *Vance*, a group of foreign service officers challenged the constitutionality of Section 632 of the Foreign Service Act of 1946, 22 U.S.C. § 1002, which required all persons covered by the Foreign Service retirement system to retire at age 60. The plaintiffs argued that the mandatory retirement age violated the equal protection component of the Fifth Amendment's Due Process Clause because it failed the rational basis test: There was no mandatory retirement age for comparable employees in the Civil Service, and at least some foreign service officers were perfectly capable of performing their duties after age 60. The Court disagreed, citing to the complexity of the legislative scheme and the difficulty of making more precise distinctions. 440 U.S. at 109, 99 S.Ct. 939. The regulatory scheme at issue here suffers from no such problems.

"potential life." [19] An anencephalic fetus has no brain. The condition is uniformly fatal to a fetus. The physical structure necessary for brain function is entirely absent. Whether the fetus' heart may continue to beat, or its lungs to breathe, for a few days or a few weeks, it cannot survive. It can never experience consciousness at any time, even after birth. There is no cure for anencephaly; the focus of medical research is on discovering its cause.

As discussed above, there is a strong likelihood that an anencephalic pregnancy must be ended artificially—whether in its early stages, as an abortion, or at term, as an induced birth or a cesarean section. Since the fetus' chances of survival and of ever experiencing consciousness remain at zero, while the medical, emotional and financial costs to the woman grow with time, it is, as I noted in *Britell I,* difficult to imagine any legitimate state interest that is served by "encouraging" grieving parents to opt for continuation of the pregnancy.

### b. *Legal Status of Anencephaly*

Funding the abortion of anencephalic fetuses is not the first occasion on which the federal government, and, indeed, other governmental entities, have had to consider the heartbreaking dilemmas faced by anencephaly. The issue has arisen with respect to the question of whether a doctor has an obligation to provide medical treatment to anencephalics, in the event the woman decides to continue her pregnancy and the fetus is not stillborn. While not controlling, the right to treatment debate

is helpful to this analysis in two respects. First, it offers an analogy to the case at bar—that in other settings anencephaly has been treated as so incompatible with "potential life" that a physician may withhold treatment. Second, it bears on CHAMPUS's concerns that covering abortions of anencephalics will lead down the "slippery slope" to funding abortion of other lethal fetal anomalies, which is inconsistent with the statutory mandate. With respect to the obligation to provide treatment to gravely ill newborns, the government has carved out anencephaly as a special case; no "slippery slope" has resulted.

In the early to mid–1980s, a legal and ethical controversy arose over the "Baby Doe" decisions,[20] issued in 1982, where an infant born with Down's Syndrome and a life-threatening esophageal defect died after the infant's parents refused consent for corrective surgery and the courts refused to intervene. In the course of the long and convoluted history of the "Baby Doe" controversy over medical treatment for handicapped infants, anencephaly came to be seen by legal and ethical commentators, as well as the federal government itself, as situated at the far end of the spectrum of potential life. *See, e.g.,* Mark A. Bonanno, *The Case of Baby K: Exploring the Concept of Medical Futility,* 4 Annals Health L. 151, 171–72 (1995)("[H]ealth care providers or the legislature should be permitted to develop criteria for making end-of-life decisions, which would allow physicians—in an extremely narrow case such as anencephaly—to decide that aggressive

---

19. Significantly, in *McRae,* the state's interest is described in terms of *"potential* life" and not simply *"life."* It was for that reason that the court sustained the state's denial of Medicaid coverage for the abortion of a non-viable fetus (when the mother's life was not endangered).

20. In re *Infant Doe,* No. GU8204–004A (Ind. Ct.App. Apr. 12, 1982), *writ of mandamus dismissed sub nom. State* ex rel. *Infant Doe v. Baker,* No. 482 § 140 (Ind.Sup.Ct. May 27, 1982), *cert. denied sub nom. Infant Doe v. Bloomington Hospital,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983).

treatment is not the best course of therapy."); Nancy K. Rhoden, *Treatment Dilemmas for Imperiled Newborns: Why Quality of Life Counts*, 58 S. Cal. L.Rev. 1283,1306 (1985) (describing anencephaly at the extreme end of the continuum of medical conditions in which the obligation to treat has been raised).

The report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, for example, expressly cited to anencephaly. It maintained that "[w]hen there is no therapy that can benefit an infant, *as in anencephaly* ..., a decision ... not to try predictably futile endeavors is ethically and legally justifiable." President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research ("President's Commission"), *Deciding to Forego Life–Sustaining Treatment: A Report on the Ethical, Medical, and Legal Issues in Treatment Decisions* 219 (1983) (emphasis supplied). Recognizing that opinions differ as to when potential prolongation of life is meaningful, the Commission suggested that this guideline "applies to babies whose lives will end in infancy and are likely to be measured in hours or days, not years," of which anencephaly was an ex-

ample. *Id.* at 219 n. 81. And this theme—the total incompatibility of anencephaly with "potential life"—has been reflected in subsequent regulations.[21]

If anencephaly is inconsistent with "potential life" in this setting, namely, after birth and a full term pregnancy, surely it is equally inconsistent with potential life in the setting that the Britells confronted.

### c. *Case Law*

As I noted in *Britell I*, 150 F.Supp.2d at 224, the case of *Karlin v. Foust*, 188 F.3d 446 (7th Cir.1999), is apposite. While the *Karlin* case as a whole addressed allegations that the Wisconsin informed-consent statute placed an "undue burden" on a woman's right to obtain an abortion, the court specifically addressed the application of the notification statute in cases involving lethal anomalies like anencephaly. The court rejected the notion that the Wisconsin statute's information requirements—intended under normal circumstances to encourage a woman to carry her baby to term—would further any "legitimate purpose." In such cases, the court noted:

> [T]he mandatory provision of information relating to a father's child support obligations and the availability of state childrearing assistance serves no legitimate state interest and makes little

---

21. Regulations promulgated after the Commission's report specifically provided, "[f]utile treatment or treatment that will do no more than temporarily prolong the act of dying of a terminally ill infant is not considered treatment that will medically benefit the infant." 45 C.F.R. pt. 84, App. C, ¶ (a)(2). Significantly, an "illustrative example" of an application of the new guidelines was as follows: "[W]ithholding of medical treatment for an infant born with anencephaly, who will inevitably die within a short period of time, would not constitute a discriminatory act [on the basis of handicap] because the treatment would be futile and do no more than temporarily prolong the act of dying." *Id.*, ¶ (a)(5)(iii). These regulations were invalidated in federal court as federal adminis-

trative overreaching into an area of state regulation without sufficient proof of discrimination, *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). Similar provisions are found in another funding statute, the Child Abuse Prevention and Treatment Act of 1984, which conditioned the receipt of federal funding for child abuse prevention and treatment programs on the state legislatures' adoption of infant Doe laws governing the circumstances under which a physician was obliged to intervene to save the life of an infant. 42 U.S. § 5101–5106. And while the implementing guidelines to CAPTA do not expressly mention anencephaly, it is clear that the condition fits the standard for "withholding medical treatment."

sense.... We fail to see how the provision of this largely irrelevant information helps a woman 'facilitate the wise exercise of [her abortion] right.'

188 F.3d at 489 n. 16 (*citing Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 887, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). Their findings on anencephaly were based on the same kind of equal protection analysis described here and, significantly, the same rational-basis standard. Indeed, the court underscored the fact that these findings were entirely independent of the court's substantive "undue burden" analysis. *Id.*

As the *Karlin* court recognized, where a fetus suffers from a condition that guarantees both imminent death and no hope of ever functioning or attaining consciousness, it makes little sense to maintain that measures aimed at encouraging women to carry their pregnancies to term serve the interest of protecting "potential life."

### 2. *The Moral Interest in Preserving Life*

There is no doubt that some people believe that it is immoral to intentionally terminate the life of an anencephalic fetus, no matter how ephemeral that life may be. To those individuals, the brief period before an anencephalic fetus' heart stops and its respiration ceases is "life" which must be preserved at all costs.

CHAMPUS concedes that neither the text of the statute, 10 U.S.C. § 1071, nor its legislative history makes any mention of such a rationale. The CHAMPUS program was designed to provide an "improved and uniform program of medical and dental care." *Id.* Funding for abortions was carved out because of the state's interest in "potential life." Neither the statute nor the legislative history suggest that the "real" concern behind the funding restrictions was a moral one, different

from and broader than the government's interest in promoting potential life. Nevertheless, CHAMPUS argues that the state's interest in "potential life" must be viewed from a moral and ethical, not just medical, perspective.

CHAMPUS first notes that the Supreme Court has established clearly that justifications advanced in support of legislative classifications need not have been articulated at the time the legislation was first contemplated—nor, for that matter, at any other specific time. *See, e.g., Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *FCC v. Beach Communications,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Rather, the rational-basis standard requires the reviewing court to uphold a legislative classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. The court is not empowered to make decisions on the basis of whether the law seems to be sound policy, operates to the disadvantage of a particular group, or appears to be grounded in a tenuous rationale. *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Boivin v. Black,* 225 F.3d 36, 44 (1st Cir. 2000).

Second, CHAMPUS points out that the Supreme Court and the lower federal courts have established that public morality interests can be legitimate grounds for legislation. *E.g., Barnes v. Glen Theatre,* 501 U.S. 560, 569, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (holding public indecency statute constitutional because it furthers substantial governmental interests in protecting "the social interest in order and morality"); *Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 92 L.Ed.2d 140

(1986); *Milner v. Apfel,* 148 F.3d 812, 814 (7th Cir.), *cert. denied,* 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 463 (1998); *see also Williams v. Pryor,* 240 F.3d 944, 949 (11th Cir.2001) ("crafting and safeguarding of public morality" as rational basis for statute prohibiting commercial distribution of any device primarily used for stimulation of human genitals).

It is certainly true that Congress "legislates morality" all the time, whether by criminalizing conduct (e.g., nude dancing, sodomy, or prostitution) or by subsidizing some endeavors to the detriment of others (e.g., childbirth counseling to the detriment of abortion counseling; *see Rust v. Sullivan,* 500 U.S. 173, 201, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). It is also true that the Supreme Court has been quite clear that rational basis review does not mandate the articulation of a legislative purpose *at all,* much less at any particular time in the life cycle of the legislation in question.

This case, however, is different. It not only involves legislating morality, it offers that ground as a post hoc justification for the legislation. In other words, while a morality-based justification for legislation may be legitimate when articulated at some point during the legislation's history, and while a more concrete rationale may not require earlier articulation, the combination of the two—a morality interest and the lack of any evidence as to its actual salience—threatens to render rational basis review totally meaningless. If the only rationale offered for a statute is a general, morality-based concern, evidenced nowhere in the record, and not hashed out in the legislative process, *any* statute could pass muster. All the government would need to do is to allege that the statute serves some hypothetical moral concern, regardless of whether or not that concern reflected the philosophy of a minority of its citizens, or was shared by others in a diverse, pluralistic society.

Every case that CHAMPUS cites involves a statute whose *express* purpose, articulated either on the face of the statute or in the legislative debates, was the protection or encouragement of public morality. *Barnes v. Glen Theatre* and the other nude dancing cases involve zoning laws or outright prohibitions on adult entertainment establishments, where the clear, unequivocal, and express purpose of the regulation in question is the promotion of public morality. The same is true of *Bowers v. Hardwick,* which sustained the constitutionality of Georgia's prohibition on sodomy. And in *Milner,* the distinction in question involved a population of individuals not convicted of a criminal act by reason of insanity. In this arena, the criminal law, morality concerns were traditional and long-standing. As Judge Posner observed, "[a] traditional purpose of criminal punishment is to express moral condemnation of the criminal's acts." *Milner,* 148 F.3d at 814.

Even accepting that the rationale behind the abortion funding restrictions was a moral concern about the sanctity of life, the justification is still problematic as applied to a fetus with anencephaly. CHAMPUS draws an analogy to *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), and the right-to-die cases. In *Washington v. Glucksberg,* three terminally ill patients' former physicians and a non-profit organization that counsels people considering physician-assisted suicide brought suit challenging a statute that banned assisted suicide. The court affirmed the statute in part on the ground that the ban was rationally related to legitimate government interests, namely "the preservation of human life." Significantly, the court expressed profound concerns about the implementation of physi-

cian-assisted suicide. It was concerned about coercion in end-of-life situations, about discrimination against the handicapped, and about the slippery slope to euthanasia.

The government's own regulations in the "right to treatment" context, the so-called "Baby Doe" regulations, *see supra* note 21 and accompanying text, suggest that this analogy is misplaced. The government has already promulgated guidelines allowing for the withholding of medical treatment for anencephalics, precisely because of the futility of medical care. And those regulations, which were intended to address concerns about discrimination against infants born with birth defects, have drawn a clear line around anencephaly.[22] Refusing treatment in the case of anencephaly did not pose a selective non-treatment problem, nor, as is described below, did it implicate any troubling "slippery slope."

The potential life interest of an anencephalic fetus, utterly incapable of ever experiencing consciousness, whose existence is measured in "hours or days," as the President's Commission noted, President's Commission, *Deciding to Forego Life–Sustaining Treatment: A Report on the Ethical, Medical and Legal Issues in Treatment Decisions, supra* at 219 n. 81, cannot

be compared to that of a terminally ill patient. Terminally ill patients have interests and preferences particular to them that merit protection (i.e., their wishes about dying at all, or the circumstances of their deaths); anencephalics have no such interests, and no such preferences.

Whether or not CHAMPUS *could have* promulgated the regulations at issue here because of a belief that life must be preserved at all cost, it is clear that it *did not.* Indeed, such a rationale would have been fundamentally inconsistent with the "Baby Doe" regulations. To suggest that the state should deny insurance coverage to encourage women to carry anencephalics to term, but permit parents and physicians to refuse medical intervention for such infants at birth makes little rational sense.

### 3. *Legislative Deference in Funding Cases*

CHAMPUS emphasizes the fact that the courts have shown particular deference to legislative funding decisions in a number of equal protection cases. These cases, in their assessment of the legitimate state interests involved, maintain that legislative line-drawing is particularly necessary in the face of "finite" funds that cannot be stretched to meet the needs of all constitu-

---

**22.** To be sure, at least one court has also held that under the Emergency Medical Treatment and Active Labor Act ("EMTALA") an anencephalic is a "disabled person" and may not be discriminated against in the provision of emergency services, *if a parent requests such services. In the Matter of Baby K,* 832 F.Supp. 1022 (E.D.Va.1993), *aff'd,* 16 F.3d 590 (4th Cir.), *cert. denied,* 513 U.S. 825, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994). Significantly, Baby K's mother explicitly and repeatedly requested that the hospital treat her anencephalic infant, and it is precisely this interest—the right of the mother to insist on such treatment, even though the hospital, the doctors, and the hospital Ethics Committee found it to be medically and ethically inap-

propriate—that the Fourth Circuit sustained. Plainly, the wishes of a mother who made a different choice—one more consistent with the advice of the professionals—would likewise be respected. Second, the Baby K case involved emergency treatment; Baby K had gone into respiratory failure, and her mother wanted her placed on a respirator. As the Fourth Circuit explained in a subsequent case, the scope of the hospital's obligation under EMTALA turns on the patient's need for emergency stabilization, not for further, long- or indefinite-term non-stabilizing measures. *Bryan v. Rectors & Visitors of the Univ. of Va.,* 95 F.3d 349, 352 (4th Cir.1996). The "Baby Doe" regulations described above address that kind of aggressive care.

ents. *E.g., Baker*, 916 F.2d at 753 ("Having determined that the financial assistance ... is finite and cannot meet the full standard of need in all cases, the legislature was entitled to decide in whatever rational way it preferred which categorical grant recipients could be expected to bear the hardships of an inadequate standard of living"). Where holding any particular alternative distribution of funding unconstitutional under equal protection would simply shift the burden of inadequate funds to other constituents, the argument is stronger that a court should defer to the original legislative choice.

In the present case, however, Britell's decision to terminate her pregnancy resulted in a net cost *savings* to everyone involved (except Britell herself). The costs associated with carrying her anencephalic fetus to term would almost undoubtedly have exceeded the costs of the abortion. Further, the higher costs of inducing birth or dealing with the consequences to Britell's health *would* have been covered by CHAMPUS. And, because anencephaly is a very distinctive condition that is easy to recognize—and would normally be recognized—in the course of normal prenatal care, the additional "transaction costs" of determining which fetuses are anencephalic would be negligible to nonexistent.

As it now stands, Britell alone bears the burden of the CHAMPUS funding restrictions. There is no suggestion that removing that burden from her shoulders would shift it to another constituent's—or, for that matter, to CHAMPUS', given the greater costs of carrying the fetus to term.

### 4. Whether "Invidious" Discrimination is Involved

CHAMPUS' next argument is that the scope of protection under the Equal Protection Clause goes no further than the prevention of "invidious discrimination," citing to a line of Supreme Court doctrine articulated in cases such as *FCC v. Beach Communications*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Since the distinctions being drawn here are not "invidious" ones, CHAMPUS argues, they do not trigger equal protection analysis, and therefore do not even qualify for rational basis review.

What is "invidious" discrimination? The Constitution is mute on the subject. The Supreme Court, despite having identified it as part of the mix of factors in equal protection analysis, has never provided a definition,[23] and, at times, addresses the "rational relations" test without reference to the word "invidious" at all.[24] Dictionary definitions tend to be quite broad: *see, e.g.*, Webster's Third New Int'l Dictionary 1190 (1976) (defining "invidious" as, in relevant part, "of an unpleasant or objectionable nature," "causing harm or resentment"); Black's Law Dictionary 480 (7th ed.1999)

---

**23.** The closest the Court has come is to contrapose invidious discrimination with benign discrimination, which suggests a notion that could be characterized as something like "aimed at hurting" as opposed to "aimed at helping." *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 243–45, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (Stevens, J., dissenting).

**24.** As Justice Stevens explained in his concurrence in *Cleburne*, "I have always asked myself whether I could find a 'rational basis' for the classification at issue. The term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word 'rational' ... includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." 473 U.S. at 452, 105 S.Ct. 3249 (Stevens, J., concurring).

(defining "invidious discrimination" as "[d]iscrimination that is offensive or objectionable, esp. because it involves prejudice or stereotyping").

In the constitutional context, however, "invidious" tends to imply something more than mere unpleasantness or objectionability, though exactly what that "something more" *is* is hard to pinpoint. While it often manifests itself in a group-based context, *see, e.g.*, Black's Law Dictionary, *supra*, and *Adarand*, 515 U.S. at 243, 115 S.Ct. 2097, the Supreme Court has established that "groupness" is *not* a prerequisite for invidiousness. *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (holding that a "class of one" may have an actionable equal protection claim, whether facial or as applied in nature).

If "invidious" simply means harmful, offensive, or objectionable, then, even if the defendants are correct that a plaintiff must first cross an "invidiousness" threshold to maintain an equal-protection claim, Britell has clearly done so. Insofar as the defendants argue that "invidiousness" is something more, even a cursory survey of the Supreme Court's equal protection jurisprudence reveals a rather different picture.

The issue of invidiousness functions not as a threshold requirement for an equal protection analysis, but rather as a continuum through the different levels of constitutional scrutiny. The approach of the case law is categorical: Protection against particularly "invidious" discrimination is what strict and heightened scrutiny are for, while most classifications are subject to rational basis review. *See Cleburne*, 473 U.S. at 440–41, 105 S.Ct. 3249 (classifications based on factors "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy" are subject to strict scrutiny); *Craig v. Boren*, 429 U.S. 190, 197–99, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (where gender-based "archaic and overbroad generalizations" and "increasingly outdated misconceptions concerning the role of females ..." persist, gender-based statutory classifications are subject to heightened scrutiny). Put another way, the Supreme Court and the lower courts have dealt with "invidiousness" on the axis of degree of scrutiny, not by making it a prerequisite for even the most relaxed form of equal protection analysis.

In any event, however one defines "invidious," there *is* invidious discrimination lurking here. Women of means, who can afford to obtain abortions without insurance coverage, will not be deterred by CHAMPUS' policies regarding anencephaly, while poorer women might. Such women will be forced to wait nine months before seeking medical termination of a pregnancy. And at the end, their fetuses' chances of viability will be *no greater* after nine months than they would have been in the first trimester. Indeed, since the fetuses' potential for life is ephemeral, one impact of CHAMPUS's regulation—in addition to the financial one—is to stigmatize such women for their legitimate moral choice to terminate their anencephalic pregnancies. As justification for a regulatory enactment, this function runs afoul of both law and reason.

### 5. *Whether Allowing Insurance Coverage Here Raises the Specter of the "Slippery Slope"*

Finally, CHAMPUS raises the specter of the "slippery slope," claiming that any potential review of the legislative value judgment undertaken here will lead us to voluntary and, eventually involuntary, euthanasia—or, as one commentator described the argument, because "we can draw no rationally defensible line between the two." Eric Lode, Comment, *Slippery Slope Arguments and Legal Reasoning*, 87 Cal. L.Rev. 1469, 1469 (1999).

It is simply not the case that it is impossible, or even difficult, to stop this particular "downward slide" at anencephaly. As discussed above, anencephaly is a very distinctive physical condition with not just life-threatening, but fundamentally life-*incompatible* consequences for the fetus. Conditions like Down's Syndrome and most fetal heart defects, which CHAMPUS cites as examples of conditions jeopardized by the "slippery slope," do not compare. Moreover, as discussed before, both the President's Commission and the Department of Health and Human Services endorsed the "Baby Doe" regulations, in which even the most *conservative* standard allowed for the non-treatment of anencephalics.

More troubling from a theoretical perspective is the notion that Britell should be denied relief simply because the condition of her fetus somehow lies on the same axis, albeit far away from, arguably more ambiguous conditions. In other words, the sole justification for excluding anencephaly from coverage would be a negative one— we cannot draw the line with sufficient precision. Just as our legislatures are capable of comprehending that not every taking of a human life is murder, and not every taking of property is theft, so too we are more than capable of understanding that not all fetal abnormalities—much less life-threatening medical conditions in humans of all ages—are the same. Bright-line rules can certainly serve a valid purpose in helping to clarify a complicated area where data points are very close to one another, but they cannot, and should not, serve as an excuse to avoid acknowledging meaningful distinctions where they exist.

## V. CONCLUSION

There can be little question that the rational-basis standard is a highly deferential one, as well it should be. Still, I cannot accept—and the law does not require—that "rational basis" review is a mindless rubber stamp.

There is no rational justification for CHAMPUS' refusal to fund Britell's abortion of her anencephalic fetus. Through the funding power the government seeks to encourage Britell and women similarly situated to suffer by carrying their anencephalic fetuses until they are born to a certain death. This rationale is no rationale at all. It is irrational, and worse yet, it is cruel.

Accordingly, Britell's motion for summary judgment [docket entry # 17] is **GRANTED**, and CHAMPUS' motion for summary judgment [docket entry # 29] is **DENIED**.

**SO ORDERED.**