**Maureen M. BRITELL,**
**Plaintiff–Appellee,**

v.

**UNITED STATES, Defendant–**
**Appellant.**

No. 03–1282.

United States Court of Appeals, Federal Circuit.

June 24, 2004.

Simon Heller, The Center for Reproductive Rights, of New York, NY, argued for plaintiff-appellee. With him on the brief were John H. Henn, Jessica M. Silbey and Seth Nesin, Foley Hoag LLP, of Boston, Massachusetts.

Gregory G. Katsas, Deputy Assistant Attorney General, Civil Division, Appellate Staff, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Eric D. Miller and Robert M. Loeb, attorneys.

Before MICHEL, BRYSON, and PROST, Circuit Judges.

MICHEL, Circuit Judge.

Defendant–Appellant United States ("the government") appeals from the May 29, 2002 Order of the United States District Court for the District of Massachusetts granting summary judgment to Plaintiff–Appellee Maureen M. Britell ("Britell") in this Little Tucker Act case seeking reimbursement for the cost of an abortion. The district court ruled that 10 U.S.C. § 1093(a) violated the Equal Protection Clause of the Fifth Amendment to the United States Constitution under a rational-basis review because its ban on funding abortions could not be justified on the basis of the state's interest in "potential human life" because such an interest was not relevant as to anencephalic fetuses. *Britell v. United States*, 204 F.Supp.2d 182, 192–93 (D.Mass.2002) ("Britell II"). Because we hold that under

Supreme Court precedent section 1093(a)'s funding ban is rationally related to the state's legitimate interest in potential human life, even in cases of anencephaly, section 1093(a) does not violate the Equal Protection Clause under a rational-basis review, and so we must reverse.

## BACKGROUND

In January 1994, Britell and her husband, a Captain in the Air National Guard, were expecting their second child. *Id.* at 183. A routine checkup about twenty weeks into her pregnancy revealed that Britell's fetus suffered from a rare condition called anencephaly;[1] the diagnosis of anencephaly was confirmed by a second ultrasound. *Id.* at 186. Faced with this horrific diagnosis, and the certain death of the fetus or newborn, the Britells consulted their family, doctors, grief counselors, psychiatrists, and their parish priest, all of whom agreed that the Britells should abort the fetus. *Id.* On February 18, 1994, Britell had an abortion at the New England Medical Center—after thirteen hours of physically and emotionally painful labor, the fetus died during delivery. *Id.* The diagnosis of anencephaly was confirmed. *Id.*

After the abortion, the New England Medical Center sought payment for its services from Britell's insurer, the Civilian Health and Medical Program ("CHAMPUS"). *Id.* In fulfilling its statutory mandate to "provid[e] an improved and uniform program of medical and dental care for members ... of [the uniformed] services, and their dependents," 10 U.S.C. § 1071 (2000), CHAMPUS funds all "medically necessary services and supplies associated with maternity care." 32 C.F.R. § 199.4(e)(16)(i) (2003). In the present case, however, CHAMPUS denied the claim based on 10 U.S.C. § 1093(a) and corresponding regulations.[2] *Britell II*, 204 F.Supp.2d at 186. Section 1093(a) provides in relevant part that "[f]unds available to the Department of Defense may not be used to perform abortions except

---

1. Anencephaly is a neural tube defect in which the fetus develops without forebrain, cerebellum, or cranium. *Britell II*, 204 F.Supp.2d at 185. In place of a brain, the fetus develops with a gelatinous tissue covering the crown of the head. *Id.* The condition is fatal: most anencephalic fetuses die during pregnancy or birth, and the few (thirty-two percent) of anencephalic fetuses that are carried to term can survive for up to two months with continuous life support and intensive care. *Id.* Without life support and intensive care, fewer than two percent of anencephalic fetuses carried to term will survive longer than seven days. *Id.* Even those that survive, with or without intensive care and life support, will never gain consciousness because they possess no cerebrum. *Id.*

Anencephaly also poses health risks to the mother. *Id.* Towards the end of the pregnancy, women carrying anencephalic fetuses produce excessive amniotic fluid, increasing the risk of placental abruption (premature separation of the placenta from the uterine wall),

which can, in turn, cause abnormally accelerated blood clotting and simultaneous uncontrolled bleeding (disseminated intravascular coagulopathy), placing the mother at grave risk. *Id.* Moreover, because anencephalic fetuses have abnormally small adrenal glands (which play a critical role in triggering labor), the mothers of anencephalic fetuses must often have delivery induced or face the many health risks associated with late-term pregnancy. *Id.*

Beyond these physical risks, the emotional toll of anencephaly is undeniable. These mothers are faced with the horrifying knowledge that the fetus they are carrying will die, never having achieved consciousness.

2. Though CHAMPUS denied the majority of the New England Medical Center's claim, it did cover some of the costs associated with an emergency surgical procedure to remove the placenta that Britell underwent after delivery. *Britell II*, 204 F.Supp.2d at 186 n. 8.

where the life of the mother would be endangered if the fetus is carried to term." 10 U.S.C. § 1093(a) (2000). The CHAMPUS regulations specifically provide that abortions performed in the case of "fetal abnormalities" including anencephaly are not covered by CHAMPUS. 32 C.F.R. § 199.4(e)(2) (2003).

After the claim was denied by CHAMPUS, the New England Medical Center sued Britell in state court and obtained $4,000 through a settlement. *Britell II,* 204 F.Supp.2d at 186. Britell then filed suit against the United States in the United States District Court for the District of Massachusetts seeking "liquidated and unliquidated damages incurred when Defendant, pursuant to the Civilian Health and Medical Program of the Uniformed Services (hereinafter 'CHAMPUS'), 10 U.S.C. § 1093(a) and 32 C.F.R. § 199.4(e)(2), refused to pay or reimburse any portion of $4,500 in medical costs incurred by plaintiff Maureen Britell relating to an abortion medical procedure performed upon her at New England Medical Center on February 18–19, 1994." In her complaint, Britell alleged that section 1093(a) "has no rational basis as applied to abortions performed where the fetus is suffering from a lethal anomaly, such as anencephaly (absence of all or significant part of the fetal brain)" and that "the section 1093 exclusion violates the Fifth Amendment of the United States Constitution." Britell's complaint alleged that the district court had jurisdiction pursuant to 28 U.S.C. § 1346(a) (the "Little Tucker Act") which provides that district courts have original jurisdiction over any civil action or claim against the United States, not exceeding $10,000 in amount, founded upon the Constitution, and also under 28 U.S.C. § 1331 because the action alleged a violation of the Fifth Amendment.

Because the Supreme Court had previously held, in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), that the language of the Hyde Amendment (language in the Medicaid statute prohibiting the use of federal funds to reimburse the cost of abortions "except where the life of the mother would be endangered if the fetus were carried to term") was facially constitutional under the Equal Protection Clause, Britell's challenge was narrow in scope. Britell argued that section 1093(a) was only unconstitutional "as applied" to her and similarly-situated pregnant women because the ban on CHAMPUS funding for abortions in cases of anencephaly does not further any of the legitimate state interests identified in *McRae* as supporting the facial constitutionality of congressional abortion funding restrictions. The government responded by arguing that there is no such thing as an "as applied" equal protection challenge to a statute whose facial constitutionality has been sustained, and that, in any event, the denial of funding in Britell's case passes muster under rational basis review because it encourages childbirth and is thus rationally related to the legitimate state interest in potential human life.

After several rounds of briefing, the district court issued a May 16, 2001 Memorandum and Order addressing the parties' arguments concerning as-applied equal protection challenges, and deferring the parties' motions for summary judgment pending further briefing. *Britell v. United States,* 150 F.Supp.2d 211 (D.Mass. 2001) ("Britell I"). First, the district court rejected the government's argument that *McRae* was controlling, instead accepting Britell's argument that her case was distinguishable from the ruling in *McRae,* upholding the *facial* validity of the Hyde Amendment, because Britell's

challenge was a valid *as-applied* constitutional challenge. *Id.* at 223. The district court traced the history of "as-applied" jurisprudence, noting that the Supreme Court had recognized as-applied challenges dating back to at least 1985, when it decided *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). After finding that Britell could make an as-applied challenge to a facially constitutional statute, the district court addressed the allegedly-unconstitutional statutory distinctions. *Britell I* at 226 ("I find that an as-applied challenge to CHAMPUS' funding regulations is entirely appropriate and is not precluded by the Supreme Court's holding in *McRae*."). Britell argued that two statutory distinctions were unconstitutional: (1) the broad distinction between medically necessary pregnancy services (funded) and the medically necessary abortion of an anencephalic fetus (unfunded); and (2) the narrower distinction between terminations of ectopic pregnancies or treatment of spontaneous, missed, or threatened abortions [3] (funded), and abortions of anencephalic fetuses (unfunded). *Id.* at 223–26. The district court deferred resolution on the first distinction pending additional briefing by the parties, noting that "[s]ignificant questions of law remain, however, regarding the state interest advanced by denying funding for termination of anencephalic pregnancies, while allowing funding for other medically necessary pregnancy services," including whether the government's " 'moral' justification for its funding scheme satisfies the equal protection standard" and "if not, does some

other, as-yet-unidentified state interest justify. that scheme?" *Id.* at 226. With regard to the second distinction, the court found that "CHAMPUS' decision to fund termination of ectopic pregnancies and treatment of spontaneous, missed, or threatened abortions is rationally related to the legitimate state objectives of preserving maternal health and protecting potential life." *Id.*

After allowing the parties to present additional briefing on the question "[e]ven if the failure to fund abortion of an anencephalic fetus was not rational—because it did not involve potential or even conscious life—was it still possible to justify the policy on moral grounds," the district court once again considered the parties' motions for summary judgment. *Britell II*, 204 F.Supp.2d at 188 n. 16. On May 29, 2002, the district court granted summary judgment to Britell, holding that the state's interest in potential human life was not legitimate in cases of anencephaly. *Id.* at 192–93. The district court also held that section 1093(a) could not be justified on the basis of a "moral interest in preserving the life" because Congress had not actually considered that interest when it enacted the statute. *Id.* at 195. The district court also noted that, even to the extent a moral interest in the sanctity of life was the justification for the statute, that justification would not apply in cases of anencephaly because it is a "very distinctive condition." In addressing the government's argument that the Equal Protection Clause protects only against "invidious discrimination," the district court noted that section 1093(a) effects "invidious discrimi-

---

**3.** A spontaneous abortion is commonly known as a miscarriage. *Britell I,* 150 F.Supp.2d at 215 n. 11. A missed abortion occurs when the remains of a dead fetus are retained in the uterus for several weeks. *Id.* at 215 n. 12. A

threatened abortion occurs when a woman experiences some symptoms of a miscarriage during her first trimester but does not lose the fetus. *Id.* at 215 n. 13.

nation" against poor women. *Id.* at 196–97. Accordingly, the court entered summary judgment in favor of Britell and ordered that Britell recover $4,000 plus costs.

The government filed a notice of appeal to the First Circuit. *Britell v. United States,* 318 F.3d 70, 72 (1st Cir.2003). After recognizing that Britell had invoked district court jurisdiction based in part on the Little Tucker Act, the government moved for a transfer to this court pursuant to 28 U.S.C. § 1631; Britell agreed with the government that this court should hear the appeal. *Id.* The First Circuit agreed to transfer the case, explaining that "the record reveals beyond hope of contradiction that we [the First Circuit] lack jurisdiction to decide the merits of the government's appeal" and that "while the statute [28 U.S.C. § 1295(a)(2)] contains some wiggle room, no way around its jurisdictional mandate applies in the circumstances at hand." *Id.* at 72–73 (citations omitted). The First Circuit granted the government's motion to transfer, *id.* at 76, and this appeal followed.

This opinion follows the court's consideration of the parties' briefing, oral argument heard on March 2, 2004, and the parties' supplemental briefing on jurisdiction pursuant to the court's order on March 2, 2004.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(2).

## DISCUSSION

On appeal, the parties' arguments are essentially identical to those made before the district court. The government argues that Britell does not have a valid as-applied challenge and that *McRae* thus controls. Further, to the extent Britell's as-applied challenge is valid, the government argues that section 1093(a) is constitutional because the statute is rationally related to legitimate state interests, including the protection and promotion of potential human life. Britell, on the other hand, argues that the district court correctly held that her challenge is a valid as-applied challenge, and that as applied to her, section 1093(a) is unconstitutional because the distinction between medically necessary services and what she argues are medically necessary abortions in cases of anencephaly is not rationally related to any legitimate state interest.

Before addressing the parties' arguments on the merits of Britell's equal protection challenge, however, we reach the threshold issue of whether there has been an adequate waiver of sovereign immunity to allow Britell's suit against the government to proceed to the merits.

## I.

■ "Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver. The terms of consent to be sued may not be inferred, but must be 'unequivocally expressed.'" *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citations omitted). "The Tucker Act contains such a waiver, giving the Court of Federal Claims [and district courts] jurisdiction to award damages upon proof of 'any claim against the United States founded either upon the Constitution, or any Act of Congress.'" *Id.* (citations omitted); 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act does not, however, create any substantive right enforceable against the government.

*White Mountain,* 537 U.S. at 472, 123 S.Ct. 1126. Rather, a statute, or regulation, may create a right capable of grounding a claim within the Tucker Act's waiver of sovereign immunity *only* if the statute or regulation is "reasonably amenable to the reading that it mandates a right of recovery in damages." *Id.* (citations omitted); *Fisher v. United States,* 364 F.3d 1372, 1377–78 (Fed.Cir.2004) ("We read *White Mountain* to have revised the *Mitchell* test for determining whether a statute is money-mandating for purposes of jurisdiction in a Tucker Act suit. The previous test of 'fairly interpreted as mandating compensation' is now stated as whether the statute in question is 'reasonably amenable to the reading that it mandates a right to recovery in damages'...."). The Supreme Court has made clear that, though "the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." *Id.* (citations omitted).

■ The parties argue that the CHAMPUS statute, chapter 55 of Title 10, is a money-mandating statute such that the Little Tucker Act, 28 U.S.C. § 1346(a), constitutes an adequate waiver of sovereign immunity for Britell's claim to be adjudicated on the merits.[4] We disagree. The CHAMPUS statute itself is not money-mandating with regard to its beneficiaries; at best, the statute confers an entitlement to medical services and care.

Specifically, section 1079 reads:

To assure that medical care is available for dependents, as described in subparagraphs (A), (D), and (I) of section 1072(2) of this title, of members of the uniformed services who are on active duty for a period of more than 30 days, the *Secretary of Defense,* after consulting with the other administering Secretaries, *shall contract,* under the authority of this section, *for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate.* The *types of health care authorized under this section shall be the same as those provided under section 1076 of this title,* except as follows:....

10 U.S.C. § 1079 (2000) (emphases added). Section 1076, in turn, provides that "[a] dependent described in paragraph (2) *is entitled,* upon request, *to the medical and dental care* prescribed by section 1077 of this title in facilities of the uniformed services, subject to the availability of space and facilities and the capabilities of the medical and dental staff." *Id.* § 1076(a)(1) (emphases added). Under section 1078, the Secretary is authorized to impose a "minimal charge" for outpatient services provided under section 1076. *Id.* § 1078(b) ("As a restraint on excessive demands for medical and dental care under section 1076 of this title, *uniform minimal charges may be imposed for outpatient care.* Charges may not be more than such amounts, if any, as the Secretary of Defense may prescribe after consulting the other administering Secretaries, and after a finding that such charges are necessary." (emphasis added)). Thus, medical services are typically provided at only a minimal charge to the dependent beneficiary, but no provision in the statute mandates, or even allows for, payment to beneficiaries as reimbursement for medical services received from private health care providers. Indeed, if anyone is entitled to payment

---

4. Indeed, at least one Claims Court decision has held that the CHAMPUS statute is money-mandating. *See Ulmet v. United States,* 17 Cl.Ct. 679, 708–09 (1989).

**1378**

under the statute, it is the health care provider seeking reimbursement from CHAMPUS. Under the statute, the Department of Defense "shall contract, under the authority of this section, for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate." *Id.* § 1079(a).

■ Because the CHAMPUS statute does not provide the requisite money-mandate, we turn to the CHAMPUS regulations for money-mandating language sufficient to bring Britell's claim within the sovereign immunity waiver of the Little Tucker Act. The Department of Defense regulations, unlike the statute, include provisions mandating the payment of money directly to the beneficiaries as reimbursement for medical services received. Specifically, the regulations provide that, "[s]ubject to all applicable definitions, conditions, limitations, or exclusions specified in this part, the CHAMPUS Basic Program *will pay for* medically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care." 32 C.F.R. § 199.4(a)(1)(i) (2003) (emphasis added). The regulations make clear that "CHAMPUS benefit *payments are made either directly to the beneficiary* or sponsor or to the provider, depending on the manner in which the CHAMPUS claim is submitted" and that "[w]hen the CHAMPUS beneficiary or sponsor signs and submits a specific claim form ... any

CHAMPUS benefit payments due as a result of that specific claim submission will be made in the name of, and mailed to, the beneficiary or sponsor." *Id.* § 199.7(h), (h)(1) (emphasis added). This and other courts have repeatedly held that this type of mandatory language, e.g., "will pay" or "shall pay," creates the necessary "money-mandate" for Tucker Act purposes. *See, e.g., Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed.Cir.2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."). At a minimum, the language in the CHAMPUS regulations is "reasonably amenable to the reading that it mandates a right of recovery in damages" as required for the Little Tucker Act waiver of sovereign immunity to apply.[5]

■ To the extent there is a question of whether the Department of Defense regulations cited above can be money-mandating where both the statute and regulations specifically *disallow payment* for abortions except where the life of the mother is at risk, we find the parties' citations to *Gentry v. United States,* 212 Ct.Cl. 1, 546 F.2d 343 (1976), to be compelling. In *Gentry,* a predecessor to this court held that it did have jurisdiction over an equal protection challenge to a single provision in a statute because that provision was severable from the remainder of the statute. The Court of Claims stated:

> If the [arguably unconstitutional provision] is not separable from the other

5. Footnote 42 in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), is not to the contrary. Footnote 42 arguably suggests, albeit in dicta, that a court must be able to imply a private right of action from a statute or regulation for it to mandate compensation for purposes of the Tucker Act, and that statutes in the context of entitlement programs, such as Medicaid or CHAMPUS, are not money-mandating because they provide litigants with substantive rights but no private right of action to enforce those rights. Though the extent of the requirement that a private right of action be conferred on a party for claims under the Tucker Act is unclear, we find that the money-mandating language in the CHAMPUS regulations implicitly confers such a right of action upon Britell and that Britell may thus pursue her claims.

language of the statute, this court has no jurisdiction to grant recovery to plaintiff, whether the [provision] is constitutional or not. If constitutional, the [provision] bars plaintiff from the entitled classes, and he can point to no law that authorizes a payment of money to him. If unconstitutional and not separable, the legislative scheme authorizing payment falls, and there is no other law providing for the disbursement of such benefits.

*Id.* at 347.

"The question of severability is answered by a practical inquiry into the legislature's intent on the internal relation of the various statutory provisions. ' "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." ' " *Id.* (citations omitted). Here, the condition for severability is clearly met. The CHAMPUS statute and regulations were enacted to "create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents," 10 U.S.C. § 1071, a purpose completely unrelated to the funding (or non-funding) of abortions. The severability of section 1093(a) is even more clear because it was added to the CHAMPUS statute after the remainder of the statute was passed. Where the arguably-unconstitutional provision is added to the remainder of the statute after the fact, it is unquestionably

*not* "evident that the legislature would not have enacted those provisions [the remainder of the CHAMPUS statute] which are within its power, independently of that which is [allegedly] not [section 1093(a) ]," because the legislature did just that. Thus, in the present case, severability is clear.

In view of the above, we find that the CHAMPUS regulations are "reasonably amenable to the reading that it mandates a right to recovery in damages," such that there has been an adequate waiver of sovereign immunity under the Little Tucker Act.[6] We thus proceed to the merits of Britell's equal protection challenge.

## II.

With regard to the merits of Britell's appeal, the parties argue two core issues on appeal: (1) does the decision in *McRae*, upholding the facial validity of an abortion funding restriction identical to the one here, preclude Britell's as-applied challenge; and (2) if *McRae* does not preclude Britell's as-applied challenge, is the challenged statutory provision rationally related to a legitimate governmental interest? We address these issues in turn.

## A.

As to the first issue—whether Britell has a valid as-applied challenge to section 1093(a) despite the ruling of *McRae*—we find that this court need not reach the issue because, even if Britell has a valid as-applied challenge, Britell's equal protection challenge fails because section 1093(a) passes a rational basis review. According-

---

6. It is worth noting that neither party nor the district court nor the First Circuit questioned or even addressed the validity of Britell's claims under the Little Tucker Act. Now that this court has determined in the first instance that Britell's claims do indeed fall under the Little Tucker Act, this court's jurisdiction under 28 U.S.C. § 1295(a)(2) is clear.

ly, we move directly to the second, outcome-determinative issue.

### B.

■ "The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity. It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless 'the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective.'" *McRae,* 448 U.S. at 322, 100 S.Ct. 2671 (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). The presumption of constitutional validity does not exist, however, where the statutory classification is predicated on "suspect" criteria, e.g., race. *Id.*

■ In *McRae,* the Supreme Court determined that the Hyde Amendment, restricting Medicaid funding to abortions where the life of the mother is at risk, "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy," and does not "impinge[ ] on the constitutional protected freedom of choice recognized in *Wade* " because every woman has the same range of choice in deciding whether to obtain an abortion. *Id.* at 315–16, 100 S.Ct. 2671. The Supreme Court also noted that the language of the Hyde Amendment "is not predicated on a constitutionally suspect classification" because the Supreme Court had "held re-

peatedly that poverty, standing alone is not a suspect classification." *Id.* at 322–23, 100 S.Ct. 2671. In light of the uniformity between the language of the Hyde Amendment and that in section 1093(a), there can be no doubt that the classification drawn in section 1093(a) neither impinges on a fundamental right guaranteed by the Constitution nor is predicated on a suspect classification.

■ Accordingly, the remaining question is whether section 1093(a) is "rationally related to a legitimate governmental objective." *Id.* at 324, 100 S.Ct. 2671. The government suggests several possible legitimate governmental objectives in justification of section 1093(a): (1) the protection and promotion of potential human life; (2) the creation of a bright-line rule that no birth defect justifies the use of federal funds for abortion; and (3) the accommodation of taxpayers who are strongly and sincerely opposed to abortion by not expending taxpayer funds on abortion. Because we find that section 1093(a) is rationally related to the first of these proffered interests, we need not address the other two suggested governmental interests.[7]

In *McRae,* the Supreme Court found a rational relationship between the Hyde Amendment and the state's interest in protecting potential human life. The Supreme Court's analysis of the rational relationship bears repeating:

> The remaining question then is whether the Hyde Amendment is rationally related to a legitimate governmental objective. It is the Government's position that the Hyde Amendment bears a rational relationship to its legitimate inter-

---

7. Nor need we address the government's argument that congressional funding determinations should be given even greater def-

erence than non-funding determinations reviewed under a rational basis review.

est in protecting the potential life of·the fetus. We agree.

In *Wade,* the Court recognized that the State has an "important and legitimate interest in protecting the potentiality of human life." 410 U.S., at 162, 93 S.Ct., at 731. That interest was found to exist throughout a pregnancy, "grow[ing] in substantiality as the woman approaches term." *Id.,* at 162–163, 93 S.Ct., at 731. *See also Beal v. Doe,* 432 U.S., at 445–446, 97 S.Ct., at 2371. Moreover, in *Maher,* the Court held that Connecticut's decision to fund the costs associated with childbirth but not those associated with nontherapeutic abortions was a rational means of advancing the legitimate state interest in protecting potential life by encouraging childbirth. 432 U.S., at 478–479, 97 S.Ct., at 2385. See also *Poelker v. Doe,* 432 U.S. 519, 520–521, 97 S.Ct. 2391, 2392, 53 L.Ed.2d 528.

It *follows that the Hyde Amendment, by encouraging childbirth except in the most urgent circumstances, is rationally related to the legitimate governmental objective of protecting potential life.* By subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable expenses of women who undergo abortions (except those whose lives are threatened), Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life. *Nor is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions. Abortion is inherently different from other medical procedures,*

*because no other procedure involves the purposeful termination of a potential life.*

*McRae,* 448 U.S. at 324–26, 100 S.Ct. 2671 (footnotes omitted) (emphases added). And the holding in *McRae* is consistent with numerous decisions in which the Supreme Court has recognized a legitimate (and in many cases compelling) state interest in protecting and promoting potential human life. *See, e.g., Planned Parenthood of Southeastern Penn. v. Casey,* 505 U.S. 833, 875–76, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("*Roe v. Wade* was express in its recognition of the State's 'important and legitimate interests in preserving and protecting the health of the pregnant woman [and] in protecting the potentiality of human life.' ... The very notion that the State has a substantial interest in potential life leads to the conclusion that not all regulations must be deemed unwarranted.") (citations omitted); *Beal v. Doe,* 432 U.S. 438, 445–46, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) ("[T]he state has a valid and important interest in encouraging childbirth.... [I]t is a significant state interest existing throughout the course of the woman's pregnancy."); *see also Stenberg v. Carhart,* 530 U.S. 914, 930, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Maher v. Roe,* 432 U.S. 464, 478, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). These decisions all recognize a state's interest in potential human life as existing prior to viability of the fetus, and becoming a compelling state interest upon viability. *See, e.g., Casey,* 505 U.S. at 870, 112 S.Ct. 2791; *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 516–17, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Recognizing, as she must, the long line of precedent supporting the government's

argument that the state has a legitimate governmental interest in protecting potential human life, Britell argues that there is no legitimate governmental interest in protecting an anencephalic fetus because the fetus will never gain consciousness. Accordingly, Britell seeks a reading of the statute to require an additional exception to the abortion-funding ban in cases of anencephaly. *Britell I,* 150 F.Supp.2d at 223 ("Judgment in Britell's favor would simply require that this Court (1) excise the parenthetical '(e.g., anencephalic)' from 32 C.F.R. § 199.4(e)(2), and (2) declare that 10 U.S.C. § 1093(a) may not be interpreted to proscribe funding for abortions in cases of fetal anencephaly."). And indeed, the district court so held, relying on *Karlin v. Foust,* 188 F.3d 446 (7th Cir. 1999), which it characterized as recognizing that "where a fetus suffers from a condition that guarantees both imminent death and no hope of ever functioning or attaining consciousness, it makes little sense to maintain that measures aimed at encouraging women to carry to term serve the interest of protecting 'potential life.'" *Britell II,* 204 F.Supp.2d at 193.

It is here that we must disagree with both the district court and Britell. As an initial matter, it is worth noting that *Karlin* is neither binding upon this court nor factually analogous to the present case. *Karlin* involved a challenge to an informed consent law under an "undue burden" analysis. In a single footnote, the Seventh Circuit noted that the defendants did not contest that the informational requirements of the informed consent law (requiring that women seeking an abortion be informed of the father's obligations concerning child assistance) would not apply in cases of lethal fetal anomalies, but nevertheless went on to reject such informational requirements on the ground that

they did not further a legitimate state interest. The *Karlin* court explained that it viewed the term "lethal anomaly" to signal that "the child will die at birth," *Karlin,* 188 F.3d at 489 n. 16; nowhere did the *Karlin* court address anencephaly specifically. The distinction is important because, despite both the district court's and Britell's intimations to the contrary, an anencephalic fetus does not necessarily die at birth. Thus, even if the *Karlin* court is correct that the state does not have a legitimate interest in potential human life in cases of "lethal anomaly," it does not follow that anencephaly is such a condition. More importantly, however, we reject both the district court's and Britell's reliance upon *Karlin* because we find it inconsistent with Supreme Court precedent as discussed below.

█ Supreme Court precedent makes clear that, from the very start of the pregnancy, there is a legitimate state interest in the potential human life. *Casey,* 505 U.S. at 846, 112 S.Ct. 2791 ("[T]he State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.... Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term...."); *Webster,* 492 U.S. at 519, 109 S.Ct. 3040 ("[W]e do not see why the State's interest in protecting potential human life should come into existence only at the point of viability, and that there should therefore be a rigid line allowing state regulation after viability, but prohibiting it before viability."); *Beal,* 432 U.S. at 446, 97 S.Ct. 2366 (noting in the context of an

abortion funding case that "it [potential human life] is a significant state interest existing *throughout the course of the woman's pregnancy*"). The state has a legitimate interest in potential human life *before* anyone knows whether the fetus will be carried to term, or even reach viability, and this legitimate state interest exists even where the fetus is diagnosed with an abnormality or birth defect. Indeed, the Supreme Court has expressly noted that states have an " 'unqualified interest in the preservation of human life' ... regardless of physical or mental condition." *Washington v. Glucksberg,* 521 U.S. 702, 728–29, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting *Cruzan v. Director, Mo. Dep't of Health,* 497 U.S. 261, 282, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)).

For us to hold, as Britell urges, that in some circumstances a birth defect or fetal abnormality is so severe as to remove the state's interest in potential human life would require this court to engage in line-drawing of the most non-judicial and daunting nature. This we will not do. We agree with the government's argument that the type of line-drawing urged by Britell can create a slippery slope. It is not the role of the courts to draw lines as to which fetal abnormalities or birth defects are so severe as to negate the state's otherwise legitimate interest in the fetus' potential life. The district court opined that there was no slippery slope with regard to anencephaly because "anencephaly is a very distinctive physical condition with not just life-threatening, but fundamentally life-*incompatible* consequences for the fetus." *Britell II,* 204 F.Supp.2d at 198 (emphasis in original). We cannot agree. No reason has been presented, nor do we see one, to explain why consciousness (or extended life span) is the lynchpin of potential human life. Indeed, it could rea-

sonably be argued that other birth defects or abnormalities, while different in their effects on the fetus, are also so severe as to negate the state's interest in potential human life. If that is the case, courts will be forced to determine on a condition-by-condition or abnormality-by-abnormality basis whether a fetus' condition is so severe as to eliminate the state's interest. Such line-drawing is something for which courts are ill-equipped, and is inconsistent with existing Supreme Court jurisprudence on what constitutes a "potential human life."

Without question, Congress could have drafted the abortion-funding ban of section 1093(a) differently, perhaps allowing exceptions in cases of severe birth defects or fetal abnormalities or even in cases where the health of the mother is at risk. Congress chose not to draw those lines, and we must respect that decision. Under rational basis review, "the constitutionality of state classifications ... cannot be determined on a person-by-person basis." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 85–86, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Indeed, congressional line-drawing "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," such that there will almost certainly be "some harsh and apparently arbitrary consequences." *Mathews v. Diaz,* 426 U.S. 67, 83–84, 85–86, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Put simply, "[p]erfection in making the necessary classifications is neither possible nor necessary." *Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). And so it is that, even if Britell and the district court are correct that the funding ban of section 1093(a) is not perfect in that it does not

allow for an exception in cases of anencephaly, Britell and the district court are incorrect that the statute fails under rational basis review. Supreme Court precedent makes clear that the state has a legitimate interest in any potential human life, even that of an anencephalic fetus. As much as in *McRae*, the language of section 1093(a) is rationally related to this state interest, and therefore section 1093(a) passes equal protection muster.

## CONCLUSION

Although this court, and surely all humankind, feels great sympathy for any parent faced with the truly horrifying diagnosis of anencephaly, we find that the law is clear: the state has a legitimate interest in potential human life from the outset of a woman's pregnancy, regardless of a diagnosis of a severe birth defect or fetal abnormality. Because, by analogy to *McRae*, the language of section 1093(a) is rationally related to this legitimate state interest, section 1093(a), just as the Hyde Amendment to Medicaid, passes rational basis review. The language of the two bans on funding is virtually identical, and the differences, for constitutional rational basis review, between Medicaid and CHAMPUS are insignificant. Accordingly, the district court's entry of judgment for Britell, must be

*REVERSED.*

## COSTS

Each party shall bear its own costs.